## IN THE UNITED STATES DISTRICT COURT FOR MARYLAND
## BALTIMORE DIVISION

| | | |
|---|---|---|
| **TERRY LEE NICKENS** | * | |
| | * | |
| **Plaintiff** | * | |
| **v** | * | CASE NO.:  1:13-cv-01430-RDB |
| | * | |
| **STATE EMPLOYEE CREDIT UNION** | * | |
| **OF MARYLAND,** *et al* | * | |
| | * | |
| **Defendants.** | * | |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

### PLAINTIFF'S RESPONSE TO DEFENDANTS'
### STATEMENT OF UNDISPUTED MATERIAL FACTS

1.   Terry Lee Nickens, the Plaintiff in this proceeding, is currently fifty-six (56) years of age. (EEOC Charge, attached to Plaintiff s deposition (Exhibit 1) as Plaintiff s Dep. Exh. 1).

> **Denied. Plaintiff is currently fifty-seven years old.  (See Plaintiff's Affidavit @ ¶ 2)**

2.   She is an African-American female (Amended Complaint, ¶ 2).

> **Admitted.**

3.   Ms. Nickens began her career with SECU as a part-time bank teller in October 1995 (Id. ¶ 13; Plaintiff s Deposition (Exhibit 1) at 22). At all times relevant hereto, she was assigned to SECU's Towson, Maryland branch. *Id.*

> **Denied. Plaintiff began her career as a Supplemental part-time Teller on August 14, 1995. See Exhibit C.**

4.   As a bank teller Plaintiff was responsible for handling cash, taking care of the cash drawer, and performing financial transactions for customers. (SECU calls customers "members.") *Id.* at 29-30. As a teller, Plaintiff was expected to scrupulously "account for every penny" she handled (*Id*. at 30). Careful cash management meant that there was neither an overage nor shortage at the end of the shift, a practice that was occasionally rewarded with a $100 incentive (*Id*. at 31-32).

**Admitted.**

5. Plaintiff recalled receiving a written warning for being $200 off when balancing her cash drawer at the end of a shift, whereas another employee (Erica Bell) was terminated for a $500 shortage (*Id*. at 33).

**Admitted.**

6. After three (3) years as a teller, the Plaintiff was promoted to the position of loan counselor with a concomitant raise in her salary (*Id*. at 35-36). In that capacity she was responsible for processing loans, taking loan applications, reviewing credit reports, and turning over the paperwork to a loan officer (*Id*. at 37-38). As a loan processor the Plaintiff reported to loan supervisor Patricia Brune (*Id*. at 38-39).

**Denied. Plaintiff was never promoted to loan processor or loan counselor. On August 14, 1995, Plaintiff was hired in the position of a Supplemental Teller. On October 10, 1995, Plaintiff was promoted to the position of a Full Time Teller. On October 9, 1996, Plaintiff was promoted to the position of Member Services Representative I. On March 7, 2001, Plaintiff was promoted to the position of a Member Services Representative II. On March 14, 2002, Plaintiff was promoted to Member Services Representative III Assistant Loan Department Supervisor. (See Plaintiff's Affidavit @ ¶3, and Exhibit C) (Bates Stamped Page 00000766 and 000777 Exhibit J).**

7. After another three (3) years the Plaintiff was promoted to a loan assistant supervisor with another concomitant raise in her salary (*Id*. at 39). Her duties included signing off and approving loan documents, payroll, and closing/opening the branch (*Id*. at 43).

**Denied. *See response to disputed fact six (6).* Additionally, Plaintiff was doing the job of supervisor for (2) two years prior to being promoted to loan assistant supervisor without a**

**pay increase. (See Plaintiff's Affidavit @ ¶ 6 and Exhibit C) (Bates Stamped Page 000773 and 000777 "Exhibit J") (Bates Stamped Page 00772 and 000777 "Exhibit J").**

8.   After approximately seven (7) of her eight (8) years as an assistant loan supervisor, Ms. Brune retired in 2008 and her supervision was undertaken by assistant branch manager Tracy Shank (Id. at 41-42), a white female.

**Plaintiff admits that Ms. Brune retired in 2008.  Plaintiff denies that Tracy Shank took over Ms. Brune's position as assistant loan supervisor.  Defendant changed Plaintiff's job responsibilities to include that of Ms. Brune's and Plaintiff continued to perform those duties for approximately two (2) years.** *See response to disputed fact six (6).*  **(See Plaintiff's Affidavit @ ¶ 6)**

9.   The SECU Towson branch employed approximately seven (7) or eight (8) employees in the loan department, which was also known as the "platform." (*Id*. at 44.)

**Admitted.**

10. Since at least 2008, the Plaintiff was placed on a number of successive performance improvement plans (also called "PIP's") for poor performance, many  of them driven by sub-standard year-end evaluations (*Id*. at 45).

**Plaintiff admits that she was placed on a number of successive performance improvement plans (also call "PIPs") but disputes and contends that it was an effort to constructively orchestrate her termination. Plaintiff successfully completed her PIPs. Defendant did not consider the PIPs when terminating the Plaintiff. (See Jerry Williams Affidavit at ¶36, Plaintiff's Affidavit @ ¶8)**

11. Most PIP's contained 60-day deadlines within which progress must be shown towards meeting the goals set in the plans (*Id*. at 47).

**Admitted.**

12. Where an employee's year-end performance evaluation was scored less than a 2.0, that employee was placed on a PIP (*Id*. at 47-48).

**Denied. Plaintiff has no knowledge regarding the procedure for putting employees with less than a 2.0 on a PIP. Moreover, it was Plaintiff's understanding that employees would be administered progressive discipline before being placed on a PIP.  See Exhibit ¶9.**

13. Often a PIP would be accompanied by a written warning regarding a particular dereliction (*Id*. at 50).

**Denied.  The PIPs were for infractions of SECU policy that were common-place among other personnel at SECU. Plaintiff was never warned prior to being put on a PIP, despite SECU's own mandate that requires progressive discipline. (See Plaintiff Affidavit @ ¶9, Exhibit C)**

14. For a period of about two (2) years following Ms. Brune's departure, the Plaintiff performed Ms. Brune's duties as well as her own (*Id*. at 51), but Plaintiff claimed not to have received any additional compensation on account of taking on these further responsibilities (*Id*. at 51-52).

**Admitted. Additionally, Plaintiff did not received training for these additional duties. (See Plaintiff Affidavit @ ¶¶6 and 10, Exhibit C)**

14. In addition to her loan officer duties the Plaintiff began evaluating approximately seven (7) subordinate employees after the departure of Ms. Brune (*Id*. at 53).

**Admitted in part. Plaintiff, as a Manager supervised and evaluated subordinates. (See Plaintiff Affidavit @ ¶¶6,8,10,11 and 12, Exhibit C)**

15. Throughout the time in which Ms. Shank supervised the Plaintiff, their relationship was respectful and professional (*Id*. at Tr. 58).

**Denied. Ms. Shank consistently blamed Plaintiff for all of the wrongs of employees that she was not trained to supervise. (See Plaintiff Affidavit @ ¶10, Exhibit C)**

16. Both Tracy Shank and branch manager Carlos Edwards, an African-American, jointly evaluated the Plaintiff commencing in or about 2010 (*Id*. at 59). Mr. Edwards also treated the Plaintiff respectfully and professionally (*Id*. at 60).

**Denied. Tracy Shank and Carlos Edwards blamed Plaintiff for not seeing pieces of the ceiling fall onto the floor, for not being able to perform the job of two positions and for not being clairvoyant regarding their non-existing polices. (See Plaintiff Affidavit @ ¶¶7, 8, 10, 11 and 12, Exhibit C)**

17. Sometime in 2010 the Plaintiff s title changed to senior FSC (financial services consultant) (*Id*. at 62).

**Admitted.**

18. In October 2010 the Plaintiff applied for and was promoted to the position of lead FSC, with a concomitant increase in her rate of pay (*Id*. at 63, 70, and Plaintiff s Deposition Exhibit 3). The position took the Plaintiff from an hourly to a salaried employee (*Id*.). In order to obtain this position, the Plaintiff underwent an interview by a panel of managers at SECU headquarters in Linthicum Heights, Maryland (*Id*. at 64-65).

**Admitted.**

19. Besides the seven (7) people she had previously supervised the Plaintiff was assigned an assistant, Bryant Mayes, also an African-American (*Id*. at 68). Mr. Mayes, whose title was senior FSC (*Id*. at 69), had prior experience in banking, having worked as a manager at BB&T Bank

prior to coming to SECU, with "experience in lending, underwriting, [and] mortgage products." (Deposition of Carlos Edwards, Exhibit 2, at 303).

**Admitted.**

20. As the lead FSC, the Plaintiff was responsible for disciplining, evaluating, and coaching her subordinate employees (Plaintiff s Deposition, Exhibit 1, at 72). Employee coaching, which was an important component of the Plaintiff s new supervisory job, involved both verbal and written counseling and regular meetings with employees which were called "Connections" (*Id*. at 73). "Connections" consisted of "tak[ing] down notes during our interviews or our talks, and I would prepare it from there. I would view their goals, their scores weekly. I would get a report - I would pull their reports, letting them know exactly where they were at weekly." (*Id*. at 73-74).

**Admitted.**

21. A typical written memorialization of a "Connection" dialogue contained notes taken by the Plaintiff reflecting the contents of her discussions with subordinate employees as well as a detailed synopsis of the employee's work-related activities and efforts at improvement (Plaintiff's Deposition, Exhibit 2).

**Admitted.**

22. When asked to identify comparators who held the same position and performed the same job duties as she did when promoted to lead FSC, the Plaintiff named only other female employees (Plaintiff's Deposition, Exhibit 1, at 84-85). Thus, there was no basis upon which to contend that a male performing the same duties was paid at a higher rate of pay than the Plaintiff.

**Admitted. Based on discovery, Plaintiff dismissed her EPA claim. (See Plaintiff's memorandum of law in opposition to the Defendants Summary Judgment Motion.**

23. During the last year and a half of her employment with SECU, the Plaintiff had regular

disagreements with Assistant Branch Manager Shank and Branch Manager Edwards over "performance of [the Plaintiff's] team," specifically "not meeting their goals, low quality." (*Id*. at 86-87.)

**Denied. The disagreement mainly involved the work of her employees, despite her attempts to assist them in understanding their roles at SECU, her frustration that Templeton-Shank and Edwards were not supporting her as manager and the lack of consistent policies and procedures. (See Plaintiff Affidavit @ ¶¶7, 8, 10, 11 and 12, Exhibit C)**

24. The Plaintiff attributed poor morale at her branch to employees being expected to "cross-sell" various financial products, which constituted new responsibilities even for tellers (*Id*. at 89). Much of the employee coaching which the Plaintiff was expected to perform involved encouraging otherwise reluctant employees to engage in a greater amount of this "cross-selling." (*Id*. at 90-91.) When employees' numbers reflected a failure to meet SECU's expectations, which included quarterly goals in terms of processing and completing loans and selling credit cards, new accounts, and other financial services, the Plaintiff received a poor review from her supervisors (*Id*. at 91-92).

**Plaintiff denies that she attributed poor morale at her branch to employees being solely because they were expected to cross-sell. (See Plaintiff's Affidavit @ ¶¶5 and 12) Plaintiff admits the rest of paragraph 25.**

25. The Plaintiff was also criticized by her supervisors due to what they perceived to be poor leadership. In other words, "[t]hey expected me to stay on top of my team and make sure they were doing their jobs. They expected me to [produce fine] quality review reports" and to "keep down on the errors. I was expected to open and close the branch, to keep up with policies and

procedures, and to make sure my employees were keeping up with policies and procedures." (*Id.* at 94.)

**Plaintiff admits that she was expected to perform the duties of her prior supervisor in addition to managerial duties. Plaintiff was giving unattainable task, and no training in this position. (See Plaintiff Affidavit @ ¶¶6, 7, 8 and 10, Exhibit C)**

26. Despite having personally trained Bryant Maines to assist her, the Plaintiff admitted that he was not "effectively" able to do so (*Id.* at 95). For instance, loans he handled "were coming back with bad reviews." (*Id.*)

**Plaintiff denies that she personally trained Bryant Maines. Bryant Maines was improperly trained by Tracy Shank and Carlos Edwards. (See Plaintiff Affidavit @_____, Exhibit C)**

27. The Plaintiff was given a written warning, inter alia, because she was responsible for loans that lacked a proper interest rate (*Id.* at 97).

**Plaintiff admits that she was given a written warning. Plaintiff disputes that she was responsible for the improper interest rate. These were loans that were written by Mr. Bryant Maines. In fact, Defendant utilized two (2) separate loan processing systems, Velocity™ from Fiserv to originate the loans, and The Complete Credit Union Solution ("TCCUS"), which managed the loan process. TCCUS had a systemic issue, wherein interest rates would be changed to zero and loan terms where changed, due to no fault of the employee. Such was the case with Plaintiff. Plaintiff notified SECU's Loan Servicing Center who was responsible for correcting the loan in TCCUS. Loan Servicing did not correct the loan. Plaintiff however, spoke with the member, who agreed to pay the interest at the end of the loan terms. SECU was not caused a loss, nor was it Plaintiff's**

**negligence that caused the error. (See Plaintiff Affidavit @ ¶¶13 and 14, Exhibit C)**

28. In one instance the Plaintiff wrongly changed the term of a loan from 60 to 72 months, in violation of SECU policy, generating an error report. (*Id*. at 101 and Plaintiff s Deposition, Exhibit 5.)

**Denied. See Response to disputed fact twenty-eight (27).**

29. The Plaintiff received an annual performance review from Defendant Tracy Shank in May 2008, covering the period March 2007 through March 2008. (Attachment I of Exhibit 3, which is the Board's statement of position provided to the Maryland Commission on Civil Rights and related attachments, all of which are referenced in an Answer to Interrogatory submitted on behalf of Tracy Templeton-Shank, Exhibit 4.) That review was rated at 2.22 overall, which indicated that the Plaintiff met (but did not exceed) all expectations (*Id*. at 2).

**Admitted.**

30. The Plaintiff received an annual performance review from Defendant Shank in April 2009 (Attachment J of Exhibit 3), covering the period March 2008 through March 2009. That review was rated at 2.00 overall, with a substandard rating of a 1.00 in the category "Planning & Organization." (*Id*. at 2.)

**Admitted.**

31. The Plaintiff received an annual performance review from Defendant Shank in April 2010 (Attachment K of Exhibit 3), covering the period March 2009 through March 2010. That review was rated at 1.41 overall, which was sub-standard and which indicated a need for some improvement (*Id*. at 2). This time she was rated at only a 1.00 in the criteria of "Leadership Skills/Behaviors." (*Id*.) In a detailed narrative prepared by Defendant Shank, it was stated that the Plaintiff "needs to be able to communicate [SECU's philosophy] to her team so they

will have a good understanding.   As of now, this is not happening . . . . Terry stays up to date with her monthly Connections dialogs but has not held her team accountable for ensuring they are meeting monthly with her for their dialogs.   Employees should be meeting once a month." (Id. at 4.)   These comments included an expression of concern that during "the 3rd and 4th quarter, the loan errors increased."  (*Id*.)  This reflected a lack of consistent coaching regarding reducing errors, as well as personal errors on the Plaintiff s part.   (*Id*. at 4-5.) Finally, this evaluation concluded with a concern that Plaintiff's employees'  "cross-sell ratios have struggled over the past year" (*Id*. at 5), referring to the number of customer services and products members of the Plaintiff s team convinced customers to purchase or utilize.

**Admitted.  Plaintiff further states that she was not properly trained to supervise these employees at that time. Furthermore, Defendant's Carlos Edwards and Tracey Templeton-Shank also received "sub-standard reviews" but were not terminated. (See Plaintiff's Affidavit @ ¶10, Exhibit B, Carlos Edwards Personnel File and Response to Interrogatories and Exhibit E, Tracey Templeton-Shank's Personnel File and Response to Interrogatories)**

32. The Plaintiff's April 2010 performance evaluation concluded with a directive, in bold letters, that the Plaintiff "[c]oach and provide assistance to the Platform [her subordinate employees] to attain a minimum of 4.01% for New Member Cross Sell Ratio and 1.26% for Existing Member Cross Sell Ratio." (*Id*. at 6.)

**Admitted. Plaintiff did in fact coach her employees. ( See Exhibit C)**

33. The Plaintiff received an annual performance review from Defendant Shank in November 2011 (Attachment L of Exhibit 3), covering the period October 2010 through October 2011. The review was rated 1.80 overall, reflecting substandard performance in both "job knowledge" and "leadership skills/behaviors." (*Id*. at 2.) In the detailed comments accompanying this evaluation,

Defendant Shank notes that the Plaintiff had been offered extensive training and support in performing her job since being promoted to FSC Team Leader (*Id*. at 4), including "Leadership classes" in "Connections for Coaches," "Business Model Changes," "Selecting Top Talent," "Retaining Top Talent," and "Coaching for Success." (*Id*.) The Plaintiff was criticized for inconsistent coaching, "especially with her team members that struggle to meet the company's expectations on a regular basis." (*Id*.) This evaluation acknowledged that the Plaintiff "was placed on a Performance Improvement Plan on 9/15/2011 for her lack of leadership." (*Id*.)

**Admitted. Plaintiff further states that while she attempted to coach her employees, they were not receptive to instruction, especially Mr. Maines. Plaintiff informed Templton-Shank and Edwards about Mr. Maines behavior, no action was taken against Mr. Maines. Plaintiff was blamed for Mr. Maines' attitude. ( See Plaintiff's Affidavit @ ¶12, Exhibit C)**

34. An "ACTION PLAN" developed for the Plaintiff by Defendant Shank on April 15, 2011 (Exhibit N of Exhibit 3) indicated continuing problems with under-performance by the Plaintiff's subordinate employees and a lack of adequate and effective coaching. A May 27, 2011 Confidential Memorandum prepared by Defendant Shank (Exhibit O of Exhibit 3) summarized Plaintiff's continuing performance issues and explained the need for an extension of her previously issued PIP:

> Since [one particular] employee's return to work at the beginning of May, you have not had any weekly follow ups, or coaching sessions with this FSC…. [Y]ou should have still continued to interact with this employee.
> …Your lack of commitment has affected the entire team's performance.

(*Id*.) For the 60 days to follow, according to this PIP extension memo, the Plaintiff was expected to "have weekly check-in's with any employees on a PIP;" "continue to have weekly coaching sessions with members of [her] team that were designated in [her] Action Plan;" and "take

ownership by following up on e-mails in a timely manner." (*Id.*) This memo concluded with a written warning that a failure to improve performance could "subject [the Plaintiff to further disciplinary action up to and including termination of [her] employment." (*Id.* at 2.)

**Admitted. Plaintiff further states that while she attempted to coach her employees, they were not receptive to instruction, especially Mr. Maines. Plaintiff informed Templeton-Shank and Edwards about Mr. Maines behavior, no action was taken against Mr. Maines. Moreover, Plaintiff successfully completed in PIP that she given, and the Defendants are now attempted to use the PIP as a red herring. Plaintiff was not terminated as a result of the PIP that she was placed on. ( See Plaintiff's Affidavit @ ¶12, Exhibits A and C)**

35. A subsequent Confidential Memorandum issued to the Plaintiff by Defendant Shank on September 14, 2011 (Exhibit P of Exhibit 3) documented an example of poor leadership, as follows:

> On Monday, 8/29[11], after receiving heavy rainfall from the weekend, yourself and the Teller Team Leader walked into the branch at 7:15 a.m. to find multiple ceiling tiles were on the floor in the lobby area from water saturation. The computers also needed rebooting due to power outages. While this was being taken care of by the Teller Team Lead, she asked a member of your team if you or someone was planning to clean up the lobby area from the debris of the fallen ceiling tiles; the team member said [that] no one was going to pick it up and planned to see if the Branch Manager was coming in that day to clean it up. Our expectation is for you to take ownership in situations like these. Instead "Of cleaning the ceiling tiles up right away, you and your team delayed, causing another team member to clean this up about 10 to 15 minutes before the branch opened at 8:00 a.m. Ceiling tiles left on the floor is not an acceptable appearance for when members enter the branch. Your responsibility is to oversee that things are taken care of whether it is done specifically by you or not. The behavior displayed by you was not professional and should not be coming from someone in a leadership position.

(*Id.* at 1.)

**Denied. This memo did not document poor leadership as it was not part of Plaintiff's**

**job description to maintain the structure of the building. Further, Plaintiff was seeking the help of maintenance to resolve the problem when another employee decided to take it upon herself to remove the debris from the lobby area. Furthermore, two (2) weeks prior, Defendant Edwards, was observed leaving the same debris on the floor, he did not remove it, yet was not placed on a PIP and was not disciplined. Furthermore, Plaintiff states that this was another attempt by the Defendant to constructively terminate the Plaintiff. Moreover, Plaintiff successfully completed in PIP that she given, and the Defendants are now attempted to use the PIP as a pretext for Plaintiff's termination. Plaintiff was not terminated as a result of the PIP that she was placed on. (See Plaintiff Affidavit @ ¶¶15 and 16, Exhibits A and C)**

36. This same Memorandum expressed a similarly serious concern about the Plaintiff s ongoing performance deficiencies as a supervisor:

> Another expectation of leadership is holding your team accountable. One of your FSC's has been consistently making errors and is reported on the monthly Loan Quality report. Over the past year, this employee has been mentioned on 9 out of the 12 reports, totaling to 3 compliance errors and 14 procedural errors. Your comments for the errors have been training issues. You are responsible for her training and this is a reflection of your training abilities. You should be having coaching/training sessions with this employee on a regular basis, especially on loans to minimize errors. Due to her errors, there is more work for you and for SECU. There is no documentation on this employee to where you have held her accountable for her multiple mistakes. There are also no signs that this issue will be addressed unless it is done by management. During your monthly Connections Dialogs, the Loan Quality report comes up and what you plan to do to stop the errors. Your plan is to sit with the FSC's while they are doing loans. This is not being done consistently and is not working due to the errors continuously happening. You need to set clear expectations for your staff to ensure we stay in compliance at all times.

(*Id*.)

**Admitted. Plaintiff further states that the employees only responded to the**

**expectations of Ms. Shank and Mr. Edwards and not those of Plaintiff. Moreover, Plaintiff successfully completed the PIP that she was given, and the Defendants are now attempting to use the PIP as a pretext for Plaintiff's termination. Plaintiff was not terminated as a result of the PIP that she was placed on. (See Plaintiff Affidavit @ ¶12, Exhibits A and C)**

37. Finally, this Memorandum expressed frustration and concern that despite Plaintiff's previous commitment to better, more consistent coaching of her employees, the Plaintiff had "not met the goal that you have set for yourself and your team is losing out on an opportunity to better themselves." (Id.) Offers of assistance from Defendant Shank were rebuffed (*Id*. at 2). This Memorandum concluded with yet another written warning that a failure to improve within the next 60 days could subject the Plaintiff to "further disciplinary action up to and including termination." (*Id*. at 3.)

**Denied. Plaintiff wanted Ms. Shank's assistance with her employees. However, Ms. Shank was more interested in creating a paper trail that would eventually cause the Plaintiff to be constructively terminated, rather than supporting Plaintiff as a Supervisor. Moreover, Plaintiff successfully completed the PIP that she given, and the Defendants are now attempting to use the PIP as a pretext for her termination. Plaintiff was not terminated as a result of the PIP that she was placed on. (See Plaintiff's Affidavit @ ¶¶7, 8, 10 and 11, Exhibits A and C)**

38. Regular follow-up meetings were conducted by Defendant Shank and the Plaintiff and duly documented during this 60-day period (*Id*. at 4-6).

**Admitted. Moreover, Plaintiff successfully completed the PIP that she was given, and the Defendants are now attempting to use the PIP as pretext for her termination. Plaintiff was not terminated as a result of the PIP that she was placed on. (See Exhibit A)**

39. Yet another Confidential Memorandum issued by Defendant Shank to the Plaintiff on November 14, 2011 (Exhibit Q of Exhibit 3) reminded the Plaintiff that she would "need to ensure that all team members are being coached on a weekly basis," and that "[t]he Loan Quality Report came out with 100% errors," a situation that "needs to drastically improve and your team must be held accountable for the multiple errors and lack of commitment for getting it right the first time." (*Id*.) This Memorandum was accompanied by yet another written warning (*Id*. at 3). Regular follow-up meetings took place in November and mid-December 2011 between the Plaintiff and Defendant Shank (*Id*. at 4-6).

**Admitted. However, Ms. Shank was more interested in creating a paper trail that would eventually cause the Plaintiff to be terminated. The regular follow-up meetings were not constructive, did not provide Plaintiff with necessary feedback and offered no solutions to correct any perceived deficiency in Plaintiff's work. However, it is important to note that Plaintiff successfully completed the PIP that she was given. Plaintiff was not terminated as a result of the PIP that she was placed on. (See Plaintiff's Affidavit @ ¶¶7, 8, 10 and 11, Exhibits A and C)**

40. A series of events in the spring of 2012 ultimately resulted in the Plaintiff s termination. As Defendant Shank testified in her deposition:

> [B]ecause of past performance, the past leadership problems that we had, and then the override that she did for a teller which caused a loss to SECU. Another part of what went into that [the Plaintiff] was responsible for loan audits. And she didn't fully review the loans that she was auditing and that she signed off on. And a few of them were booked with zero percent interest, which is how SECU collects part of its income, from loans, loan interest. So we lost money from those as well.
>     And with all of the past . . . pattern . . . it's how long are we going to let someone continue to stay here? Unfortunately, the decision had to be made to terminate her.
> (Deposition of Defendant Terry Shank, Exhibit 5, at 137-138.)

**Denied. Plaintiff further states that money was not lost on the subject loans. Further, Ms. Shank was more interested in creating a paper trail that would eventually cause the Plaintiff to be terminated. Defendant Edwards represented to the Maryland Department of Labor Licensing and Regulations ("DLLR") the basis for Plaintiff's termination. Specifically:**

> **"There were two incidents that caused her discharge. Both of these involved a monetary loss to the company and were discovered close together. The first involved the claimant signing off on a check to close an account that was flagged for garnishment. She initialled[sic] the approval for this, which resulted in a $1900.00 loss. This weighted heavily in the decision to terminate her she should've seen that this had a garnishment attached to the account. The second was that the claimant (Ms. Nickens) failed to input the interest rate on three different loans. This caused no interest rate to accrue until it was discovered, resulting in approximately a $600.00 loss."**

**Plaintiff was not terminated for being on a PIP as suggested by the Defendant. (See Plaintiff's Affidavit @ ¶¶13 and 14, Exhibit A)**

41. Explaining the Plaintiff's culpability in approving zero interest rate loans to members, Defendant Shank testified that "[w]hen she did the loan audits, the next day after the loans were booked, we had to review the loans, which at this point was between [the Plaintiff] and [her assistant] Bryant [Maines]. And she had signed off on checking these loans. And she didn't fully review them. And it didn't get caught until months later that the loans were booked at zero percent interest instead of 10 percent or 11 percent or 6 percent, whatever the loan should have been." (*Id.* at 139.)

**Denied. See also response to disputed fact twenty-eight (27). Plaintiff further states that the errors were made by Mr. Maines. Mr. Maines was derelict of duty when he failed to call Loan servicing to correct the loans in question. Plaintiff had no involvement whatsoever with these two loans, however, Mr. Maines was not terminated or disciplined, Plaintiff was.**

**Plaintiff states that the one loan she had reviewed, she took the proper steps to correct the zero interest, including reporting it to Loan servicing and the member. The member accepted the correct interest and SECU did not suffer a loss as reported to the DLLR and this Court. (See Exhibit A, Affidavit of Jerry Williams @ ¶31 and Affidavit of Plaintiff @ ¶¶13 and 14)**

42. A final dereliction that, combined with the other leadership issues documented throughout a nearly 3-year pattern of performance evaluations and PIPs, led to Plaintiff's termination was described by Defendant Shank as follows:

> I know a teller was processing a transaction, and [the Plaintiff] processed the override for her. And it was for an account that shouldn't have had an override processed. And the member took the funds out when they weren't allowed to take those funds.
>
> Q.    And did that result in a loss to the bank?
> A.    Yes.

(*Id*. at 139-140.)

**Admitted. Plaintiff further states that the "flag" was not visible on the account at the time of the transaction. Other employees under the age of 40 also removed holds from garnishments, either inadvertently or intentionally and were not terminated. (See Exhibits B and E, Affidavit of Jerry Williams @ ¶12, Plaintiff's Affidavit @ ¶17).**

43. Branch Manager Carlos Edwards corroborated Ms. Shank's recollection of the override of a barred transaction that was wrongly  approved by the Plaintiff, which ultimately  led to Plaintiff s discharge when taken into consideration with the other leadership failings and derelictions:

> Q: So if I'm understanding, the previous  year's  performance  prompted  the decision  [to terminated the Plaintiff]?
> A: It was a review of Ms. Nickens' overall performance . . . . Once we started seeing the chain of events that were happening, we just . . . Let's look at these events and make sure that this is. . .
> Q: You're saying a chain of events.   What events were  happening?
> A:  Like I said earlier, it was around, everything was· around  the  same  time with the override, and then the discovery of the loans [lacking an interest rate

were within a short time period of each other, so . . .

Q: So the prompting event would have been the override?

A: Correct.

Q: And then once you looked at the override, you said some additional information came in –

A: Correct.

Q: -- which was the zero interest loans?  So you got -tell me what happened. Who comes into your office and tells you there's an override issue?

A: Actually, it was the member [who] just left the office when we found out about the override issue. He was on the - the gentleman was on the teller line, did his transaction, and then had gone over to the platform and was working with a representative.

We received a call from our back office saying that this withdrawal had been done, did we know anything about it, and if the gentleman was still in the building, and he had left right before or right after the phone call. . .   .

Q: So what happened next?

A:   I think  they  attempted  to reach  out to the member for a couple of days  to see if they could recover the funds that were given to him, and then it was decided that I think he disputed it, . . . From that, it was a conversation . . . but it was now a loss that had happened, and we needed to take some steps towards that.

(Deposition of Carlos Edwards, Exhibit 2, at  317-320.)

**Admitted.  Plaintiff further states that the "flag" was not visible on the account at the time of the transaction. (See Plaintiff's Affidavit @ ¶17)**

44. As the Plaintiff conceded, "I did an override on an account that should not have had an override on it." (Plaintiff's Deposition, Exhibit 1, at 199.) In other words, as the Plaintiff explained, "It was an account that had a flag on it, and it was supposed to be viewed to see why there was a flag on it. . . . And I overrode - I put in my code. The teller closed down the account, and it wasn't supposed to be closed down."  (*Id*. at 200.)  The override which the Plaintiff wrongly approved cost SECU $1,900.00 (*Id*.).

**Admitted.  Plaintiff further states that the "flag" was not visible on the account at the time of the transaction. Moreover, Defendant Edwards on multiple occasions removed similar holds from an account but was not terminated, albeit disciplined. (See Plaintiff's Affidavit @ ¶17, Exhibit B)**

45. On May 31, 2012, the Plaintiff was presented with a letter of termination (Exhibit E of Exhibit 3).

**Admitted.**

46. SECU has a longstanding non-discrimination policy (Exhibit 3, Exhibit A), which "expressly prohibits discrimination based on race, color, religion, national origin, sex, age, sexual orientation, marital or veteran status, genetic background, physical or mental disability, or for any other reason prohibited by in connection with, but limited to the following: recruitment, selection, assignment, classification, promotion, demotion, transfer, termination, layoff and recall, selection for training, salaries, wages or compensation, insurance programs, pension and retirement programs, social and recreational."

**Denied. See Affidavit of Jerry Williams @ ¶¶32 through 43)**

47. This same non-discrimination policy contains a "Non-Harassment Policy" that commits SECU "to providing a work environment free of unlawful harassment . . . on the basis of race, color, religion, national origin, sex, age, sexual orientation, marital or veteran status, genetic background, physical or mental disability, or for any other reason prohibited by applicable law." (*Id.*)

**Denied. See Affidavit of Jerry Williams @ ¶¶32 through 43)**

48. SECU operates one of Maryland's largest credit unions in a highly competitive business environment. It competes with commercial banks, other credit unions, and savings and loans (Deposition of SECU CEO Rodney Staatz, Exhibit 6, at 11; Deposition of Christopher Groshko, Exhibit 7 at 27.). In order to attract new members and retain existing members, CEO Staatz recognized that SECU's employees had to "go from this order-taker mentality to a financial consultant." (Staatz Deposition, Exhibit 6, at 8.) Approximately five (5) or six (6) years ago

SECU initiated a program styled "Different Direction," the purpose of which was

> [T]o communicate to people in Maryland that we are a different way of doing banking. Because what we found is most people call it banking, it's just banking. But we at a credit union offer banking, but it's a different way of doing banking. So what we decided to do is to change the logo and then come up with the slogan, which is sort of Different Direction.
>
> Now, what it really means is take your banking . . . if you were a member of ours or a prospective member, take your banking in a different direction. Tired of the banks? Tired of what the banks represent, working for stockholders, not us, who are working for members, we want you to take your banking in a different direction. You can't fit 'take your banking in a different direction' on a logo. It just doesn't work. So we settled with Different Direction.
>
> Why? Because the marketing people that we were using, the outside consultants and internal, as it represents a thought, an idea in how to go to the market and then we can use it in different ways. That's what it was. It was a way to change the logo, a way to change the tag line so that we could go out into the market and then we'd use it in different ways. Again, trying to get people to understand they need to take their banking in a different direction and we were the one that should be able to help. That's what that is.

(Id. at 11-12.)

**Denied. Plaintiff further states that it also served a dual purpose of eliminating older employees. See Affidavit of Jerry Williams @ ¶¶32 through 43)**

49. There was no correlation between the implementation of the Different Direction marketing program and the age of the incumbent workforce (*Id*. at 14). In fact, statistics presented by SECU corporate designee Harry Florio, Jr. during his deposition reflected an almost even distribution of employees within the entire SECU organization between those over and those under the age of 40. (Florio Deposition, Exhibit 8, at 216-217 and Florio Dep. Exh. 4.) At the Towson branch, of approximately 56 full-time and part-time employees employed between January 1, 2005 and April 2015, sixteen (16), or 28.6%, were over 40 years of age. (Revised Answer to Carlos Edwards' First Set of Interrogatories, Exhibit 9).

**Denied. The implementation of the Different Direction marking program had a**

**disparate effect on the older members of the incumbent workforce. See Affidavit of Jerry Williams @ ¶¶39 through 43)**

50. Further demographic evidence presented by Mr. Florio demonstrated that  of the entire SECU workforce of 537 employees in 2012, 285, or 53% were female, while 38% were African-American, with an additional 13% consisting of "Hispanic, Asian, native or Pacific Islanders," or a total minority workforce  of  over  50 percent.  (Florio Deposition, Exhibit 8, at 218 and Florio Deposition Exh. 4.)

**Admitted.**

51. SECU did not maintain any policies,  practices  or procedures  that  were  intended to, or had the  effect  of, pushing  older workers  out of the workforce  (Florio  Deposition, Exhibit 8, at 224).

**Denied.  Plaintiff further states that the new policies, practices and procedures did have a disparate effect on older workers within the SECU workforce. See Affidavit of Jerry Williams @ ¶¶39 through 43 and Plaintiff Affidavit @ ¶5)**

52. In  response  to  a  series  of  questions  regarding  her  allegations  of  an  allegedly  racially hostile or ageist environment, the Plaintiff testified as follows:

> Q.  Have you ever had  any comment based  on race or age that  you believe  to be derogatory, made by anyone in the workplace,  like a pejorative name, the N word, anything like that suggesting the atmosphere in the workplace was discriminatory?
> A:  Not to my knowledge.
> Q:  Is the [Towson] branch a diverse place to work?  Is there that diversity   of races and ages within your branch, or were there when you were in Towson?
> A:  A majority of young people.
> Q:  What about race?
> A:  Yes, race.
> Q:  Diverse races?
> A:  Yes.
> Q:  Do you think that SECU is culturally a racist organization?  . . . You    see the members that come in and out of the branch. Could you break it down by

percentage of white and African-Americans who are your customers?

A: Towson branch is mainly -it's a combination of both.

Q: It's very diverse, isn't it?

A: Yes.

(Plaintiff's Deposition, Exhibit 1, at 259-260.)

**Admitted.**

53. Bhawana Chona an Indian-American FSC who was formerly assigned to SECU's Towson branch, was disciplined for a single instance of having made a mistake early in her employment. That mistake was to admittedly sign her husband's name to a document relating to a $500.00 personal loan, for which she received a final written warning. (Chona Deposition, Exhibit 10, at 25-26). She never made a similar mistake thereafter.

**Denied. Ms. Chona was also reprimanded for signing a document stating that she had witnessed the signature of a member when she indeed had not. Further, Chona was written up for bouncing a check in 2001. See Exhibit K (Bates Stamped Pages 00648-00652)**

54. Ms. Oney, a lead teller, recollected that SECU's "Different Direction" program was a "rebranding for SECU to direct our members to move away from big banks, take a different direction away from big banks because SECU offers all of the things that big banks offer, but we treat our members [better]." (Oney Deposition, Exhibit 11, at 18.) She did not recall any particular reason for older workers leaving her branch (*Id*. at 20, 36).

**Admitted. Plaintiff further states that Mrs. Oney was under the age of 40 and therefore, the effects of the new program did not affect her in the same way.**

55. Mr. Florio best summarized the reasons for Plaintiff s termination in May 2012: "[I]t was the lapse in judgment of everything else, the consistent pattern in the lapse of judgment from the prior things that were documented in the performance improvement plan and then the lapse in judgment around the override and the zero percent interest loans." (Florio Deposition, Exhibit 8,

at 61.)

**Denied. Plaintiff further states that the "lapse" in judgment that Mr. Florio referred to were engineered by her supervising employees at SECU in accordance with the new Different Direction marketing that favored younger employees. Plaintiff further states that the new policies, practices and procedures did have a disparate effect on older workers within the SECU workforce. See Plaintiff's response to disputed fact twenty-eight (28). See Affidavit of Jerry Williams @ ¶¶39 through 43 and Plaintiff' Affidavit @ ¶5)**

56. Plaintiff s termination for a constellation of incidents, including an overall pattern of poor leadership and management of her subordinate employees culminating with loan errors and the override of a cash withdrawal from a red-flagged account, is plainly distinguishable from the disciplinary actions taken against various SECU employees for single instances of financial errors, including Ms. Shank's approval of a check cashed by a non-SECU member (Shank Deposition, Exhibit 12, at 89-90).

**Denied. Plaintiff was terminated because she was over the age of forty (40). Similar situated employees who engaged in similar conduct, or worst conduct, such as Mr. Edwards and Templeton-Shank, were not terminated for their PIPS, removing holds from accounts and willfully violating SECU's policies and procedures. This bellies the Defendants statement. Plaintiff further states that the new policies, practices and procedures did have a disparate effect on older workers within the SECU workforce. See Affidavit of Jerry Williams @ ¶¶20 through 25 and 39 through 43, Plaintiff's Affidavit @ ¶16, Exhibits B and E)**