**IN THE UNITED STATES DISTRICT COURT FOR MARYLAND
BALTIMORE DIVISION**

| | | |
|---|---|---|
| **TERRY LEE NICKENS** | * | |
| | * | |
| **Plaintiff** | * | |
| **v** | * | CASE NO.:  1:13-cv-01430-RDB |
| | * | |
| **STATE EMPLOYEE CREDIT UNION** | * | |
| **OF MARYLAND,** *et al* | * | |
| | * | |
| **Defendants.** | * | |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

<u>**AFFIDAVIT OF JERRY A. WILLIAMS**</u>

I, Jerry A. Williams, am over the age of 18 and competent to testify herein, make this statement from my personal knowledge and is accurate to the best of my information and belief. Being first duly sworn, deposes and states:

1.  As part of the various positions I have held with the State Employees Credit Union (SECU) have become very knowledgeable of the policies and procedures of State Employee's Credit Union ("SECU").  My knowledge and expertise is in the area of Corporate Security and in some cases as pointed out below have written policies and procedures in the area of corporate security.  I have extensive knowledge of the duties of a teller and that of a Financial Services Consultant (FSC).

2.  I began my employment with State Employee's Credit Union of Maryland, Inc., ("SECU") in June, 2004 as a Teller.  I worked as a teller for approximately two (2) years.  As a Teller, I was directly responsible for serving as the first point of contact with SECU members and their banking needs. Additionally my duties as a Teller included:

- Engages with our members to ensure a memorable, welcoming experience at all times.
- Builds and deepens member loyalty by educating members on the best solution(s) to their financial well-being.

1

- Processes transactions accurately and efficiently to help members manage their finances.
- Works as one to achieve organizational goals.

3.   I was subsequently promoted to a Financial Services Consultant ("FSC").  I worked as an FSC at various branches of SECU including, Towson for approximately a year.  This is around the time I met Mrs. Terry Nickens.

4.   A Financial Service Consultant is a comprehensive financial advisor to SECU members.  Responsibilities included:

- Create a warm, welcoming and highly engaging atmosphere for our members with every interaction.  Deliver an exceptional service experience through consultative advice and counsel after applying a needs-based conversation with each member.
- Demonstrate and promote SECU's branch technology and alternative delivery channels through member driven lobby leadership and engagement.
- Partner with other leaders  to design and execute a business development strategy to grow both consumer and small business  membership within the community.
- Accountability for your own behaviors and results while helping team members enhance their ability to effectively engage with and educate our members.

5.   Subsequently, in 2006, I was contacted by Fraud Manager, Rachael Vamos and offered the position of a Fraud Investigator in the SECU Security Department.

6.   As a Fraud Investigator, I was responsible for the investigation and resolution of fraud cases to prevent losses to SECU. My additional duties were:

- Follow banking compliance regulations and the Uniform Commercial Code to prevent losses that occur from fraudulent activities to include, but not limited to, Check Fraud, Plastic Card Fraud, Forgeries, Reclamations, and Identity Theft.
- Investigate and recover negative accounts resulting from fraudulent activity.
- File criminal charges within the appropriate jurisdictions and take civil action through the legal department and/or file claims with CUNA.
- Attend court as necessary to represent SECU.
- Provide reports and status updates on recovery and fraud investigations.
- Monitor and take action on paying or declining items and notifying management of major losses during normal business hours and outside of normal business hours to include assigned weekends.
- Serve as the primary security contact for cases.
- Complete fraud training for all assigned branches on annual and as needed basis.

2

- Provide backup to other fraud investigators and assist in physical security management and monitoring.
- Investigate, process and partner with the U.S. Secret Service on all counterfeit cash received at SECU.
- Monitor suspected scams and notify branch personnel to mitigate loss.
- Assist SECU customers with fraud claims.
- Process monthly share and checking charge off procedures and report losses to Chex Systems, the Credit Bureau, and the Board of Directors.
- Work on other projects as assigned.
- Administer policy and procedures.
- Banking knowledge of Uniformed Commercial Code (UCC), Regulation CC, compliance issues, Bank Secrecy Act (BSA), and the legalities with regards to collection responsibilities.
- Investigate employee fraud and misconduct.
- Make appropriate recommendations for disciplinary action, including termination of employees that have violated Security protocol.

7.      During tenure at SECU at the start of my employment as a teller I was initially assigned to the Chadwick branch located in Security Blvd as my official location but on an as needed basis, I would work at various branches.  Subsequently, I was promoted to a Financial Services Consultant (FSC) at which time my official branch location was transferred to the Columbia branch. This was a stationary position for approximately two (2) years where my primary duties were as a FSC but would sometimes perform the duties of a teller.  I then worked as a fulltime FSC in Baltimore Branch but work at various branches as needed basis.   I worked in this capacity for approximately two (2) years.   I was subsequently promoted to a Fraud Investigator.  This position was at SECU's headquarters.  In the first five (5) to six (6) months I continued to work weekends as FSC.  I ended my career with SECU as a Lead Customer Service Representative.

8.      As a Fraud Investigator, I was responsible for the following branches: Towson, Columbia, Fullerton, Owings Mills, Hagerstown, and Timonium.  As part of my responsibilities, I would go into the branch to conduct spot checks to ensure the proper security procedures and

3

policies were being followed,  including the physical security of the branch and to ensure that the member information were properly secured consistent with the polices of Corporate Security.

9.       I also created, facilitated and conducted training sessions in the branches pertaining to best practices for fraud prevention; identify theft, fraudulent monetary items, fraudulent loans, robbery prevention, internal theft prevention, asset recovery, Bank Secrecy Act referrals and compliance with Federal, State and Local laws in addition to SECU's policies and procedures regarding corporate security.  As part of the training in fraud prevention we provided training to managerial and non-managerial branch personnel on fraud prevention devices that we provided that we able to detect fraudulent monetary instrument.

10.       I was the primary liaison for all departments housed within SECU including Collections, Member Services, Electronic Funds Transfer, Human Resources, Member Relations Branch Operations, Business Services, Loan Center, Loan Servicing Center, Information Technology, Purchasing, and the Call Center.  I wrote the security policy on automotive loan fraud, account mail-in verification procedures and revamped the guidelines and verification process of member's telephone transaction with SECU.

11.       When tellers are unable to perform, a monetary transaction, due to their authority levels in the TCCUS operating system they are required to look for notes in the system to explain the reason why.  The TCCUS operating system had at the time been a fairly new operating system.  The lockout could be placed in the branch or in in a "back office" department, known as Member Services, at the request of a legal entity and/or representative (i.e. judicial system, court, etc.).

12.       However in my tenure at SECU, as a Member Service Representative Teller, Financial Service Consultant, and Fraud Investigator, those members of the

leadership/management team have been able to make exceptions for members to have these funds made available, due to varying circumstances.  White male and female managers, assistant managers, leads, member services representatives have as a regular practice at SECU routinely overridden garnishments and did not suffer any adverse employment actions.  However, Ms. Terry Nickens was terminated for the same conduct.

13.     In my profession as a Fraud Investigator, I have personally removed funds from an account that had a garnishment lockout placed on the account, for varying reasons, such as to pay for a loss that SECU has directly incurred or as a result of a member's request who was experiencing a financial hardships.

14.     Mrs. Nickens was given the ability to perform such an override for the member, because it is generally in the ability of a SECU's leadership team member to make such decisions, based upon their authority level in the TCCUS operating system. If the authority had not been given to Mrs. Nickens, the TCCUS system would have required that a member of management with a higher authority level to override the transaction.

15.     It should also be stated that SECU had made a correction, as to the individual that Mrs. Nickens directly reported too, however they failed to note that Mrs. Nickens official title at the time of the override in question was, Team Lead for the Financial Service Consultants, and the transaction in question was performed by a teller.

16.     The teller is not being held responsible for the decision, due to her lack of authority in the TCCUS system; however it should be noted that the general protocol, when such an event happens would be for the teller to consult with a senior teller and/or the Teller Team Leader.  Both of these individuals would have also been able to provide the teller with a better

since of the authority, rules and or guidelines that were to be conducted when performing a monetary transaction.

17.     It should also be noted that at the time that this transpired, the Senior Teller and/or Teller Team Lead, would have reported to either Mr. Edwards and/or Mrs. Shank.  As stated previously, funds that are held due to a garnishment aren't debts owed to SECU Credit Union, unless they have been charged off due to a negative account held currently or previously with SECU Credit union.

18.     This incident would not have been pursued by the representatives in the Corporate Security Department, or the Collections Department, due to the lack of a direct loss by SECU Credit Union.

19.     Coaching was the opposite of Connections.  It is an informal discussion of issues that may arise which was to be addressed at the moment of the infraction.  In my capacity as a Fraud Investigator I have coached members of management as well as non-management personnel on incidents that violated or potentially could violate the policies and procedures of Corporate Security.  For example I have had to coach Carlos Edwards, then a Branch Manager of the Towson branch, on numerous occasions in reference to a blatant disregard for members' sensitive identifying information, i.e., SECU documents containing members' social security numbers, date of birth, addresses, account numbers, account information, beneficiary information, signatures etc.  Carlos Edwards would routinely leave his office door and drawers unlocked and unsecured during business hours and he was out of the immediate vicinity.  This was a serious breach of Corporate Security.  This conduct was routinely discovered during spot checks of the Towson branch. Carlos Edwards conduct would cause the branch to fail the security spot checks.

20.      I have firsthand knowledge of the multiple transactions in which Mr. Carlos Edwards (Branch Manager, Towson Branch), and Mrs. Tracy Shank (Assistant Branch Manager), which they have on numerous occasions, allowed a former employee with Enterprise Car Rentals, the privilege to negotiate fraudulent monetary items which are directly in violation of SECU policies and procedure.

21.      The incidents involving Carlos Edwards and Tracey Templeton Shank were in direct violation of SECU Security polices and procedure and were in fact preventable had they followed established security procedures; procedures that I have personally trained them on.  I was made aware of these infractions because their branch fell under my jurisdiction. Specifically, each branch is equipped with fraud prevention tools that could have been easily used to detect that the money orders were fraudulent, i.e., a black light.  Moreover, a simple phone call to me or any of the representatives in Corporate Security would have averted the losses due to our ability to check the validity of the money orders through a system provided by the Federal Government to which SECU is given access specifically for that very purpose.

22.      This individual wasn't a member of SECU Credit union, and per the funds availability policy, should not have under any circumstances been allowed to have such funds made available, nor to have those items negotiated in the first place.

23.      These incidents resulted in a direct loss to SECU Credit Union, and were a direct procedural and security violation, that would have normally resulted in termination.

24.      The money orders in question were returned from the Federal Reserve and since they were from a branch under my direct supervision the items were presented to me.  However, my manager, Ms. Rachael Vamos assumed handling of the matter and I was told not to get involved.  Ms. Vamos and the Member Relations Branch Operations handled the issue.

7

25.      It was very unusual to me Mr. Edwards and Mrs. Shanks were not terminated as a result of these transactions. I was informed at the time by my superior in the Corporate Security Department that the Member Relations/Member Operations department was shielding both Mr. Edwards and Mrs. Shank from termination.

26.      It is my understanding that there is a monetary limit of the funds that a member is able to obtain in the Drive Thru.  It is also my understanding from every position that I've held at SECU (i.e. MSR Teller, FSC, Fraud Investigator, etc.) that it is the sole responsibility of the teller that is conducting the transaction, to properly verify the identity of the individual that is performing the transaction.

27.      If a financial loss is taken due to no fault of the member, it is SECU's responsibility to make the member "whole" and provide the funds to the member, at a loss to SECU, within 48 business hours. After which time, an investigation is to be conducted by the Corporate Security Department, and an attempt to locate, assist with arresting and prosecuting the suspect(s) in question. If such a loss is unrecoverable, through the Corporate Security Department, the loss is treated as that of a Monetary one and the employee(s) involved are to be held to disciplinary action. If the loss is over a certain dollar amount, it could be a terminable offense.

28.      In my experience as a FSC, after a member applies for a loan whether it be indirectly, i.e., telephone, online, the mail or directly in person with a FSC representative, the loan is submitted to the Loan Center Department for decisoning which would result in the loan being approved, denied or counter-offered with conditions.  Branch personnel do not have the authority to determine interest rates, nor the conditions or terms of the loan.  In my experience at

SECU the operating system operating system failed to implement the loan rate that was established by the loan officer at the time of the approval of the loan.

29.       The FSC who is responsible for the processing the loan in the operating system for members who apply directly in the branch or come into the branch to settle the loan directly, is responsible for making sure all of the loan conditions are met that were established by the loan officer and the loan department.

30.       Once this process is completed there is a requirement that the loan is reviewed by a member of the FSC leadership team and/or a designated seasoned employee familiar with the loan verification process.  This verification is done in the operating system.  The loan then goes back to the FSC handling the loan and the loan is funded, if approved.

31.       At the end of the day before the loan package leaves the building, a member of the leadership team and/or a designated seasoned member of the team, performs a verification of the loan, which involves a review of the physical loan documents through use of a paper check list. This problem with zero interest or incorrect interest is not an unusual occurrence.  I have seen it is happen several times.  The error is usually detected within a reasonable amount of time (i.e., 30 days) by the Audit Department.  The error is corrected in the system and the member is notified of the error and they are held to the original agreement i.e., Promissory Note.  I have seen an issue with a zero interest error that was not corrected and SECU not suffer a loss and I am unaware of anyone who was terminated for such an occurrence.

32.       During my time at SECU and particular in my last  two positions i.e., Fraud Investigator and Lead Customer Service Representative, I had been made aware of the implementation of a Plan by the CEO Rod Staatz, and other members of Senior Management, to

eliminate approximately 80% of SECU's employees, in an attempt to reorganize SECU into a privately owned entity.

33.      Mr. Staatz was unable to legally dissolve the Credit Union and turn it into a commercial/privately owned bank, due to the bylaws that has been established when SECU was first established, and the potential lack of support needed through the votes of the members at SECU Credit Union. Mr. Staatz had decided that the best way to pursue his vision was to set up a "straw" company referred to as S3 Shared Service Solutions, LLC. The new company would take up residence at the existing physical location of SECU's physical location (971 Corporate Boulevard Linthicum, MD 21090), but the new company was to be the servicer of three Credit Unions which consisted of Bellco of 7600 East Orchard Road #400N, Greenwood Village, CO 80111 and Bethpage of 899 S. Oyster Bay Road Bathpage, NY 11714.

34.      The employees at SECU were held in the dark about the plan, to eliminate their position(s). It had been announced to the employees via a town hall conference, in which the employees were informed of a fraction of Mr. Staatz plan to take SECU in a "new direction". This new direction, involved the termination of many of the employees at SECU, over a then non-disclosed time frame. It had been explained to the employees through various channels that, they would not be given new positions at the new company and that the affected employees would need to apply for employment, initially through SECU although it wasn't supposed to be the same company as S3.

35.      As a member of the leadership team, I have received and viewed a considerable amount of complaints from members referencing Mr. Staatz, history in his tenure at other institutions, as well as the questionable tactics used to circumvent the process, required to make organizational changes on such a level.   Mr. Staatz had a previous relationship with Bellco

Credit Union, and is also now the president and CEO of SECU, in addition to being elected vice chairman of the board of directors of the Credit Union National Association (CUNA). Mr. Staatz, who has served on the CUNA Board since 2010, is also the Chair of the S3 Governing Board.

36.     It has been brought to my attention which Mr. Staatz had planned on completely dismantling SECU Credit Union, and had made key members of the Management team as well as the Board of his intentions, to eliminate SECU employees and to outsource their responsibilities to "non SECU" employees, and that this was being done in an attempt to relieve SECU's financial responsibility to tenured SECU employees, in reference to existing and potential retirements, pay increases, 401ks, and  other monetary incentives.

37.     It has been expressed to me by a Mr. Rod Flowers, whom at the time was the Vice President of Human Resources, that Mr. Staatz had this planned since his appointment at CEO of SECU Credit Union, and that he informed Mr. Flowers that if he hired him as the V.P. of Human Resources, this would be a secretive plan that he was not to talk about. Many of the members of Senior Management were aware of  the plan that Mr. Staatz had, and they were required to sign a confidentiality agreement, stating that they wouldn't share this knowledge with anyone else, including other non-informed SECU employees.

38.     It appeared that many of these employees were incentivized further monetarily, with specially created positions, which increased their rates of pay and in some cases increased their scopes of authority and granted them what also appeared to be unilateral power, within the organization. One such employee, by the name of Joseli Wright (White Female), whom worked previously with SECU in a low ranking position, left the SECU, only to return to SECU Credit Union at a later date, under a newly created position.  This employee had a very close, and what

appeared to be personal relationship with both the CEO Mr. Rod Staatz, as well as the Vice President Ms. Peggy Tucker. Ms. Wright was allowed to oversee important decisions, many of which were financial.

39.     I was alarmed at the poor financial decisions, being made by members of Senior Management, while implementing their plan to rid itself of many of the hard working employees that help to create the positive company image that the previous CEO's and members of Senior Management had helped to create. Frivolous decisions, to make $10,000.00 purchases on a single all white couch for the lobby at SECU Columbia Branch (Joseli Wright), in addition to making other very costly decisions such as completely renovating single branches of SECU on numerous occasions without an evident basis of why a second, and even third renovation in back to back fashion was necessary(Joseli Wright); costly corporate events, and personal items that benefited Mr. Staatz: such as the rewriting of his benefits package with SECU in order for him to upgrade to a newer vehicle, which SECU had been paying for, although he had not finished out the required time frame of on the contract for the vehicle that SECU had already provided for his benefit.

40.     It had become apparent to me that the entire nature of the SECU organization had changed into a corrupt and malicious environment. Many of the employees were initially unable to complain about these and similar events, because they were unaware that they were transpiring. However, many actions were already being taken in coordination with subordinate departments, within the organization in order to further the plan to eliminate many of the seasoned SECU employees; many of which were older in age and had become fully vested and well qualified in their profession.

41.     Within the early time frame that Mr. Staatz was appointed CEO, a decision was made to eliminate the formal position of Greeter, in the branches at SECU. Many of these employees were, older in age and they were now being required to transition into highly complicated positions of Financial Service Consultant(s) and were also expected and pressured to quickly adapt, learn and implement the new requirements of their positions.

42.     This was the beginning of an ongoing trend, implemented by Senior Management at SECU, in an event to push a "sales" culture. This culture consisted of unrealistic and often unattainable goals, which were being pursued in what appeared to be a blind pursuit of profiteering at the expense of the members. The environment of doing what was best for the financial needs of SECUs members had been replaced by one of greed and mismanagement of the organization.  The entire environment, changed to a seemingly hostile one that encouraged discrimination based on age and race.  It also seemed to perpetuate a sense that the employees were undervalued and expendable.

43.     At around the same time the "New Direction" was launched, SECU made a decision to bring in people who were younger, with significant commercial bank experience, and no experience with the credit union culture.  They would place these people in key branch positions such as area managers and branch managers.  They would then move seasoned older SECU employees and transfer them to another location substantial distances from their homes with the expectation that they needed to adapt quickly to their new environment.  This impacted many older SECU employee(s).  When as anticipated theses employees had difficulty with the new assignment, they would demote the employee and put the recently hired younger employee with the Commercial Bank experience in their place.

44.	There was a culture of and climate at SECU like none I had seen in my early years at SECU.   I was an idealist, aggressive believer in the integrity and value of my contribution to SECU.  I can saw unabashedly that I gave my job one hundred percent but caused to bear witness to a climate of racist, sexist, and ageist culture come to pass at SECU brought on by the apparent greed and thirst for power of the Upper Management.

I affirm under the penalties of perjury under the laws of the State of Maryland, that the above-referenced statement is true and correct to the best of my knowledge, information and belief.

FURTHER AFFIANT SAYETH NAUGHT

Jerry A. Williams

STATE OF MARYLAND
CITY OF Baltimore

> MARIAN A. HOWELL
> Notary Public - Maryland
> City of Baltimore
> My Commission Expires on
> October 3, 2017

   I, Marian A. Howell, a Notary Public for said City and State, do hereby

certify that Jerry Williams personally appeared before me this day and

acknowledged the due execution of the foregoing instrument.

SWORN AND SUBSCRIBED before me, this the 29th day of June, 20 15.

Marian A. Howell
Notary

My commission expires 10|03|2017