IN THE UNITED STATES DISTRICT COURT FOR MARYLAND
BALTIMORE DIVISION

| | | |
|---|---|---|
| **TERRY LEE NICKENS** | * | |
| | * | |
| Plaintiff | * | |
| v | * | CASE NO.: 1:13-cv-01430-RDB |
| | * | |
| **STATE EMPLOYEE CREDIT UNION** | * | |
| **OF MARYLAND,** *et al* | * | |
| | * | |
| **Defendants.** | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## AFFIDAVIT OF TERRY LEE NICKENS

I, Terry Nickens, am over the age of 18 and competent to testify herein, make this statement from my personal knowledge and is accurate to the best of my information and belief. Being first duly sworn, deposes and states:

1. I began my employment with SECU in as a Supplemental Teller on August 14, 1995.

2. I am fifty-seven years old and African American.

3. I began my employment with SECU on August 14, 1995, as a Supplemental Teller in the Towson Branch. On October 10, 1995 I was promoted to the position of a Full Time Teller. On October 9, 1996, I was promoted to the positon of Member Services Representative I. On March 7, 2001, I was promoted to the position of a Member Services Representative II. On March 14, 2002, I was promoted to Member Services Representative III/Assistant Loan Department Supervisor. My direct report was Patricia Brune, the Loan Department Supervisor. The titles later became known as Senior Financial Services Consultant (SFSC) and Financial Services Team Lead.

4. I worked as a Senior FSC for approximately six years and became very proficient at my job. I was received great Annual Performance Reviews and several awards for my hard work.

5. Around 2007, SECU engaged in a new program called "New Direction." This changed the way SECU did business. We had to cross-sell and cross-train on different Platforms. It changed the way we did our jobs and the way we interacted with the members. We had to meet quotas for the number of products sold to members each month. We were given very little training on selling these products to the members yet were penalized for not meeting our quotas. This program primarily negatively impacted the older employees at SECU who had to change years of how they were used to dealing with the members to now become aggressive sales people; had to learn to other positions such as a FSC had to learn to be a teller. Moreover, SECU drastically reduced staffing at the branch by reducing the tellers and making the FSC do the teller work. The moral at the branch dropped precipitously and the older employees began to retire, were fired for not meeting their sales goals or left due to the pressure.

6. My supervisor Pat Brune retired from SECU in 2008 and I was her responsibilities. I did not receive any training nor did I receive an increase in pay. I continued to perform my duties as a Senior FSC and assumed the responsibilities of the FSC Team Lead which I did for (2) two years. For the first year Tracy Shank the Assistant Branch Manager (ABA) assisted with the scheduling and checking new accounts. By 2009, I assumed the responsibilities for scheduling and checking new accounts as well. I would continue to perform teller services, greeting services and still had to make a quota.

7. I was officially promoted to FSC Team Lead in October, 2010. As time went on Tracy Shank began to complain that my team was not meeting their goals which meant I was not

coaching enough. Given all of the responsibilities of doing the work of the Senior FSC and that of the FSC Team Lead, the work became too much for one person. I did not have an assistant, as I had been to Pat Brune with significantly more responsibilities. I complained to Tracy Shank and to Carlos Edwards that I needed help. They subsequently hired Brian Maines. I provided training to Mr. Maines. He was successful in the first ninety (90) days probation. After, I passed him for his first ninety (90) I assigned Brian to do loan review and for the first time in my tenure at SECU working in the loan department in a supervisory role, we received a low loan review score for my department due to the errors made by Brian.

8.  I subsequently, took away the responsibility for loan reviews from Brian and began doing them myself to try and bring my department scores back up. Tracey Shank continued to complain that I was not coaching my staff sufficiently which created a significant conflict. The branch was short staffed; employees were working in multiple positions (the Greeters a largely older employees were terminated) the employees were expected to assume the role of Greeter; perform the services of a teller; full fill their sales goals; while continuing to perform their primary function of FSC. That same of list of job duties also fell to me plus managing the platform. I feel that I was set up to fail. Here I had been an exemplary employee for SECU even to the extent of being on the President's Club (being a "top performer" but due to unfair and discriminatory employment practices, I along with my peers who had been at SECU for a long time, were targeted for termination.

9.  I was placed on a PIP and was never warned prior to being put on a PIP, despite SECU's own mandate that requires progressive discipline.

10. Ms. Shank consistently blamed me for all of the wrongs of employees that I was not trained to supervise.

3

11. The disagreement mainly involved the work of her employees, despite her attempts to assist them in understanding their roles at SECU, her frustration that Templeton-Shank and Edwards were not supporting her as manager and the lack of consistent policies and procedures.

12. I tried to coach my employees but they were not receptive to instruction, especially Mr. Maines because they felt they over worked and being treated unfairly because when they failed to meet the sales quotas Plaintiff was instructed to put them on a PIP. Plaintiff informed Templton-Shank and Edwards about Mr. Maines behavior, no action was taken against Mr. Maines. Plaintiff was blamed for Mr. Maines' attitude.

13. I dispute that I was responsible for three (3) of the zero interest loans. I was responsible for one (1) such loan. The day after the loan was booked, I noted the loan had zero interest and I immediately notified SECU's Loan Servicing Center who was responsible for correcting the loan in TCCUS system. I also spoke with the member, who agreed to pay the interest at the end of the loan terms. SECU was not caused a loss, nor was it Plaintiff's negligence that caused the error. SECU utilized two (2) separate loan processing systems, Velocity™ from Fiserv to originate the loans, and The Complete Credit Union Solution ("TCCUS"), which managed the loan process. TCCUS had a systemic issue, wherein interest rates would be changed to zero and loan terms where changed, due to no fault of the employee. This was a systemic problem and this was SECU's policy for correcting the problem of loan showing zero interest.

14. However, the Loan Department apparently did not correct the loan because approximately five (5) months later I was notified I had a loan with zero interest. It was the same loan I had contacted the Loan Servicing Department about several months prior, along with

4

the member but it was apparently never corrected. Later I learned that while I was absence Brian Maines had two (2) loans that he had checked that had zero interest.

15. It was not part of my job description to maintain the structure of the building. On the day the ceiling tiles fell it had already been on the floor. The Teller leader, Donna Diamond and I both went to boot our computers for our Platforms. It was only the two (2) of us in the branch. Her system was operational and I had to reboot the Financial Services computer which was my priority. Donna Diamond who apparently, had completed booting her system decided to take it upon herself to remove the debris from the lobby area. The branch had not yet opened when she removed the debris. The matter was not discussed with me until two (2) days later at which point I was written up for the incident.

16. Furthermore, two (2) weeks prior, Carlos Edwards, was observed leaving the same debris on the floor, he did not remove it, yet was not placed on a PIP and was not disciplined.

17. Respecting the garnishment on a customer account. The Teller asked me to override the closing of an account. A "flag" was not visible on the account at the time of the transaction nor were there any notes indicating a restriction. The Teller do not have the authority to close the account because a Member must leave at least ten ($10.00) in order to keep the account open. In order to close the account a member of the leadership team with the proper authority has to authorize the closure. I ordered the closure of the account and was not aware that there was a garnishment on the account until the week of my termination.

I affirm under the penalties of perjury under the laws of the State of Maryland, that the above-referenced statement is true and correct to the best of my knowledge, information and belief.

FURTHER AFFIANT SAYETH NAUGHT

*Terry Nickens*
_____
Terry Nickens