# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### (NORTHERN DIVISION)

**TERRY LEE NICKENS**                     *

      **Plaintiff**                     *

      **v.**                     *

**STATE EMPLOYEES CREDIT UNION**  *     **Civil Action No.: 1:13-cv-1430-RDB**
  **OF MARYLAND, INC.,** *et al*.

                             *

      **Defendants**                     *

                             *

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## DEFENDANTS STATE EMPLOYEES
## CREDIT UNION OF MARYLAND, INC., CARLOS
## EDWARDS, TRACY TEMPLETON-SHANK, AND
## CHRISTOPHER GROSHKO'S REPLY TO
## PLAINTIFF'S OPPOSITION TO DEFENDANTS'
## <u>MOTION FOR SUMMARY JUDGMENT</u>

Leslie Robert Stellman (Federal Bar No. 01673)
lstellman@pklaw.com
PESSIN KATZ LAW, P.A.
901 Dulaney Valley Road, Suite 500
Towson, Maryland 21204
Telephone:  (410) 938-8800
COUNSEL FOR THE DEFENDANTS STATE EMPLOYEES
CREDIT UNION, INC., CARLOS EDWARDS, TRACY SHANK
AND CHRISTOPHER GROSHKO

# TABLE OF CONTENTS

I.   Claims Abandoned by the Plaintiff ........................................................................ 1

II.  The Individually Named Defendants Should Be Dismissed .................................... 2

III. Plaintiff's Continued Pursuit of Claims Alleging "Wrongful Termination" Is Frivolous, Warranting Dismissal if Not Sanctions ................................................... 3

IV.  The Plaintiff Has Failed to Support A Viable Claim of Age Discrimination ......... 6

    A.  Introduction ............................................................................................... 7

    B.  Plaintiff Has Failed to Demonstrate that the Reasons for Her Discharge Were A Pretext for Unlawful Age Discrimination, or that She was the Victim of Disparate Treatment ................................................................. 9

        i. The Reasons for Plaintiff's Discharge Were Not Pretextual ................. 9

        ii. Plaintiff Has Failed to Demonstrate that She was the Victim of Disparate Treatment ....................................................................... 15

    C.  Plaintiff's "Disparate Impact" Theory of Discrimination Is Similarly Unsupported ... 19

    D.  The Record Lacks Evidence that Plaintiff was Subjected to a "Hostile Work Environment Based on Her Age ..................................................... 22

V.  It is Far Too Late to Allow Plaintiff to Amend Her Complaint ........................... 25

VI. Conclusion ......................................................................................................... 26

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(NORTHERN DIVISION)

| | | |
|---|---|---|
| TERRY LEE NICKENS | * | |
| Plaintiff | * | |
| v. | * | |
| STATE EMPLOYEES CREDIT UNION OF MARYLAND, INC., *et al.* | * | Civil Action No.: 1:13-cv-1430-RDB |
| | * | |
| Defendants | * | |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## DEFENDANTS STATE EMPLOYEES CREDIT UNION OF MARYLAND, INC., CARLOS EDWARDS, TRACY TEMPLETON-SHANK, AND CHRISTOPHER GROSHKO'S REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants State Employees Credit Union of Maryland, Inc. ("SECU"), Carlos Edwards, Tracy Templeton-Shank, and Christopher Groshko (collectively referred to herein as "the Defendants"), by their undersigned counsel, hereby file this Reply in response to Plaintiff Terry Nickens' ("the Plaintiff" or "Ms. Nickens") Opposition to the Defendants' Motion for Summary Judgment (hereafter, "Plaintiff's Opposition").

**I. Claims Abandoned by the Plaintiff**

At the outset of Plaintiff's Opposition, she abandoned, via a "voluntary dismissal," most of the claims initially raised in her Amended Complaint, including claims of race and gender discrimination (Counts 1, 2, 3, and 9), claims arising under the Equal Pay Act of 1963, 29 U.S.C. § 206(d)(1) (Count 8), and various Maryland torts characterized as *"respondeat superior"* (Count 10), "civil conspiracy" (Count 13), and "negligent hiring and retention" (Count 6). Plaintiff also abandoned and dismissed Count 14, alleging a violation of 42 U.S.C. § 1981.

What remains of this case, therefore, is solely a claim of age discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.*, and its Maryland counterpart (found in Title 20 of the Government Article of the *Annotated Code of Maryland*), as well as the Maryland tort of "wrongful discharge."  Specifically, Plaintiff continues to pursue Count 4 ("Wrongful Termination"), Count 5 ("Wrongful Termination in Violation of Md. State Government Code Ann. § 20-606"), Count 7 (to the extent that it is now confined to "disparate impact" discrimination based solely upon age, in violation of Md. State Government Article Section 20-606), Count 11 ("Age Discrimination in Violation of ADEA"), and Count 12 ("Disparate Treatment – Age Discrimination in Violation of Md. State Gov't. Art. § 20-606").

## II.    The Individually Named Defendants Should Be Dismissed.

Individually named Defendant Rod Staatz, SECU's CEO, was voluntarily dismissed from the case at the close of discovery, while the remaining individually named Defendants – Tracy Templeton-Shank, Carlos Edwards, and Christopher Groshko – remain in the case, even though the sole remaining Count that continues to name such individuals as Defendants is Count 4, alleging "wrongful discharge."  Insofar as "wrongful discharge" is plainly a non-viable theory of liability under longstanding Maryland law (as will be more fully discussed below), retaining the individually named Defendants in the case borders on bad faith no doubt fueled by Plaintiff's personal animus against them.  At the very least, the remaining individual Defendants should therefore be dismissed, with some consideration given to an award of sanctions for having needlessly put these employees through the stress and anxiety of being identified as defendants in a federal civil rights lawsuit.

As one court observed in a case in which a plaintiff wrongfully sued her individual supervisors in a Title VII lawsuit:

> An action is frivolous if it "lacks an arguable basis either in law or in fact." *Neitzke v. Williams,* 490 U.S. 319, 325, 109 S.Ct. 1827, 104 L.Ed.2d

2

> 338 (1989). Under 28 U.S.C. § 1915(e)(2)(B)(i), a court may dismiss a
> complaint as frivolous if it is "based on an indisputably meritless legal
> theory" or a "clearly baseless" or "fantastic or delusional" factual
> scenario. *Neitzke v. Williams,* 490 at 327–28; *Wilson v. Rackmill,* 878 F.2d
> 772, 774 (3d Cir.1989).

*Stanford v. Hayward*, 2010 WL 255662 (D. Del. 2010), at * 1.

As we show below, retaining the individually named Defendants in this lawsuit may warrant an award of sanctions in the form of attorney's fees. *Nash v. Reedel*, 86 F.R.D. 16 (E.D. Pa. 1980) (finding that defendant was entitled to an award of attorney's fees under *Christianburg Garment Co. v. EEOC*, 434 U.S. 412 (1978), where the case was initiated in an attempt to "harass, embarrass, or abuse [the] defendant."). *See also Johnson v. Baker*, 84 Md. App. 521, 581 A.2d 48 (1980) (awarding defendant attorney's fees from the non-prevailing plaintiff under Maryland Rule 1-131, because lawsuit lacked "substantial justification").

## III.   Plaintiff's Continued Pursuit of Claims Alleging "Wrongful Termination" Is Frivolous, Warranting Dismissal if not Sanctions.

Since at least 1989, the Maryland Court of Appeals has rejected so-called "wrongful termination" cases predicated upon "public policy" violations derived from state and federal civil rights laws. *Makovi v. Sherwin-Williams Co.*, 316 Md. 603, 561 A.2d 169 (1989). *Compare Brandon v. Molesworth,* 341 Md. 621, 672 A.2d 608 (1996) (allowing discrimination claim to proceed as "wrongful termination" lawsuit where defendant employed too few employees to be subject to the jurisdiction of either the EEOC or the Maryland Human Relations Commission).[1] In *Smith v. Washington Suburban Sanitary Commission*, 2012 WL 4863399 (D. Md. 2012), Judge Chasanow explained the underlying reasoning behind *Makovi*:

> In *Makovi*, the court clarified that the tort [of wrongful termination] will
> not lie where "the public policy violated by the discharge arises from a
> statute that provides its own remedy for the violation." *Insignia Residential
> Corp. v. Ashton*, 359 Md. 560, 561–62, 755 A.2d 1080 (2000) (citing

---

[1]      Through recent legislation the name of the Maryland anti-discrimination agency was changed to the Maryland Commission on Civil Rights.   (Md. State Gov't Art. § 20-201.)

*Makovi,* 316 Md. at 626, 561 A.2d 179). The Fourth Circuit has explained the rationale for this limitation as follows: "[w]here the public policy foundation for the wrongful discharge is expressed in a statute, and that statute already contains a remedy for vindicating the public policy objectives, then judicial recognition of a wrongful discharge [tort] is considered both redundant and inappropriate." *Owen v. Carpenters' Dist. Council,* 161 F.3d 767, 774 (4th Cir.1998); *see also Makovi,* 316 Md. at 626, 561 A.2d 179 (where a statute "create[s] both the right, by way of an exception to the terminable at-will doctrine, and remedies for enforcing that exception ... the generally accepted reason for recognizing the tort, that of vindicating an otherwise civilly unremedied public policy violation, does not apply").

*Smith,* at * 3.

Maryland State Government Article Section 20-606 – upon which Plaintiff relies in asserting a "public policy" whose vindication purportedly is available through her "wrongful termination" claim – clearly provides a comprehensive statutory remedy for age discrimination claims, just as the ADEA offers a similar federal law vehicle for judicial redress, rendering "redundant and inappropriate" resort to the civil tort of "wrongful termination." *Owens,* 161 F.3d at 774. In *Higgins v. Food Lion, Inc.,* 2001 WL 77696 (D. Md. 2001), cited in Plaintiff's Opposition (at 11), Judge Williams of this Court reminded the parties that "[a]s a general rule, a wrongful termination claim may not be premised upon a public policy expressed in a remedial statute. *Chappell v. Southern Md. Hosp., Inc.,* 320 Md. 483, 578 A.2d 766, 768–71 (Md.1990); *Makovi v. Sherwin–Williams Co.,* 316 Md. 603, 561 A.2d 179 (1989)." *Id.* at * 5. *Higgins* was nonetheless allowed to proceed as a "wrongful discharge" claim because it was predicated upon the plaintiff's employer's refusal to pay him for "off the clock" work, which the Court deemed to violate the Thirteenth Amendment.

The other cases cited by the Plaintiff (Opposition at 11) did not invoke public policy that was already the subject of a remedial statutory scheme such as Maryland's Human Rights Act, now known as "Title 20." *Watson v. People's Sec. Life Ins. Co.,* 322 Md. 467, 588 A.2d 760 (1991), involved the termination of an employee in retaliation for her having filed criminal assault

charges against her supervisor, while in *McKelvey v. Canteen Corp.*, 1994 LW 149606 (D. Md. 1994), the plaintiff claimed that he was fired for raising concerns about his employer's overcharging customers. Applying an analysis derived from *Adler v. American Standard Corp.*, 291 Md. 31, 432 A.2d 464 (1981), in which Maryland's high court first recognized the tort of "wrongful" or "abusive discharge," Judge Hargrove rejected such a claim in *McKelvey* in any event, as it did not constitute a valid basis for asserting the tort. Similarly, *Lee v. Denro, Inc.*, 91 Md. App. 822, 605 A.2d 1017 (1992), also cited by the Plaintiff (Plaintiff's Opposition at 11), rejected a "wrongful discharge" claim based upon an employee's claim that she was fired for bringing disputed aviation test procedures to the attention of her boss in front of an FAA supervisor.

Putting aside the fact that in neither *McKelvey* nor *Lee* was there a public policy basis for allowing a "wrongful discharge" claim to proceed, both cases lacked an available remedial scheme for seeking redress, unlike Title VII and Title 20, whose existence has consistently precluded discrimination lawsuits predicated upon this tort. In *Ruyter v. Maryland CVS Pharmacy, LLC*, 2015 WL 759425 (D. Md. 2015), Judge Chuang of this Court very recently reiterated the longstanding notion that:

> The tort is designed to fill gaps in statutory coverage: When a plaintiff is terminated in a way that violates some public policy, but there is no statute protecting against such conduct, then the plaintiff may bring an abusive discharge claim to remedy the harm. *See Chappell v. S. Md. Hosp. Inc.*, 320 Md. 483, 578 A.2d 766, 770 (Md. 1990) (noting that an abusive discharge claim "will not lie where the public policy sought to be vindicated by the tort is expressed in a statute which carries its own remedy for vindicating that public policy"). When a plaintiff has an available remedy under a federal or state statute, however, there is no need to file a wrongful termination claim, and the plaintiff is precluded from doing so.

*Id.* at *3.

Here, the sole "public policy" basis of Plaintiff's "wrongful termination" claims lies in either the ADEA (Count 4) or Article 20 (Count 5). In light of consistent 25 year old Maryland

law, it borders on bad faith for the Plaintiff to continue pursuing these frivolous claims, which should be dismissed – and along with them, the sole remaining claims against the individually named Defendants.   Moreover, to the extent that the so-called public policy as expressed in Title VII and Title 20 form the basis of Plaintiff's "wrongful termination" claims, neither statute imposes personal liability on individual supervisors or agents of the employer. *Lissau v. Southern Food Service, Inc.*, 159 F.3d 177 (4th Cir. 1993) (Title VII); *Jackson v. Baltimore Police Dep't*, 2013 WL 1121412 (D. Md. 2013), at *4, n.14 (Title VII and Title 20); *Shabazz v. Bob Evans Farms, Inc.*, 163 Md. App. 602, 629, 881 A.2d 1212, 1228 (2005) (ADEA).[2]  Given the Maryland courts' application of Title VII and ADEA jurisprudence in interpreting Title 20, *State Comm'n on Human Relations v. Kaydon Ring & Seal, Inc.*, 149 Md. App. 666, 695–96, 818 A.2d 259 (2003), no "wrongful termination" claim should be able to proceed against any of the individually named Defendants based upon either federal or state anti-discrimination laws.

## IV.   The Plaintiff Has Failed to Support a Viable Claim of Age Discrimination.

The gravamen of the Plaintiff's Opposition may be broken down into three (3) theories of liability under the ADEA:  (1) "disparate treatment," *i.e.*, that the Plaintiff was treated differently and more unfavorably than younger comparators, most notably branch manager Carlos Edwards; (2) "disparate impact," *i.e.*, that SECU instituted a program called "Different Direction" whose impact adversely affected older, long service employees in favor of younger employees with

---

[2]      As the Court stated in *Bob Evans*, citing a Fourth Circuit ruling precisely on point:

> In *Birkbeck v. Marvel Lighting Corp.*, 30 F.3d 507, 510-11 (4th Cir.1994), the court interpreted the "employer" definition in the ADEA, which is virtually identical to the "employer" definition in Title VII, as meaning that a supervisory employee cannot be subject to personal liability under the ADEA. The court reasoned that an interpretation otherwise would produce the untenable result that an employer with less than 20 employees would not be subject to liability, because the ADEA would not apply at all, but a supervisory employee in charge of less than the minimum number of employees would be subject to liability. Adopting the reasoning underlying the Ninth Circuit's interpretation of "employer" in Title VII, the court concluded that the similar "and any agent" language in the ADEA merely is a statement of *respondeat superior* liability." *Id.* at 510.

163 Md. App. at 629, 881 A.2d at 1228.

fewer years of service; and (3) a "hostile work environment," which is based solely upon Plaintiff's contention that, for a period of about two (2) years, she was given additional work formerly performed by another supervisor without additional compensation and without adequate training and support. As we show below, each one of these theories – and the facts developed either in discovery or presented in the affidavits accompanying Plaintiff's Opposition – fails to support a viable claim of age discrimination, under both the ADEA and Title 20.

A.      **Introduction**

Plaintiff's reliance upon *Swierkiewicz v. Sorema, N.A.*, 534 U.S. 511 (2002), and its progeny (Plaintiff's Opposition at 11) as support to overcome summary judgment is unhelpful. First, *Swierkiewicz* addressed the sufficiency of a Complaint to withstand a motion to dismiss under Rule 12(b)(6). The lower pleading threshold allowed by the Court in *Swierkiewicz* has no bearing on whether the Plaintiff has developed, through the course of discovery, material disputed facts warranting that the case proceed to a jury. *See Miller v. Carolinas Health Care System*, 561 Fed. Appx. 239 (4th Cir. 2014) (noting that while a pleading may pass muster under *Swierkiewicz*, "claims lacking merit may be dealt with through summary judgment under Rule 56.")

Plaintiff's reliance upon *Wagner v. Dillard Department Stores, Inc.*, 17 Fed. Appx. 141, 2001 WL 967495 (4th Cir. 2001) (Plaintiff's Opposition at 12), is equally misplaced, since it involved a claim of pregnancy discrimination which is addressed under a completely different standard than ADEA claims. *Compare Young v. United Parcel Service,* 135 S. Ct. 1338 (2015). In fact, since the Supreme Court's landmark decision in *Gross v. FBL Financial Services, Inc.*, 129 S. Ct. 2343 (2009), mixed motive discrimination claims – *i.e.*, allegations that both legitimate and unlawful reasons motivated an adverse employment decision – no longer apply in ADEA cases. While in *Wagner* the Court looked at whether the evidence, "if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's

actions," *Wagner*, at * 148, *Gross* rejected this test in ADEA cases, interpreting the statute as requiring a plaintiff to show, by a preponderance of the evidence, that age was the "but for" cause of the employer's adverse action. *Gross*, 129 S. Ct. at 2350.

Further interpreting Congress' intent in enacting the ADEA, the Supreme Court just last month reiterated that "[u]nder the ADEA's reasonable-factor-other-than-age (RFOA) provision, an employer is permitted to take an otherwise prohibited action where 'the differentiation is based on reasonable factors other than age.' 29 U.S.C. § 623(f)(1).[3]  In other words, if an employer makes a decision based on a reasonable factor other than age, it cannot be said to have made a decision on the basis of an employee's age." *Texas Dep't of Housing & Community Affairs v. Inclusive Communities Project, Inc.*, 2015 WL 2473449 (S. Ct., June 25, 2015), at * 12. Accordingly, Plaintiff's reliance upon *Warch v. Ohio Casualty Ins. Co.*, 435 F. 3d 510, 513 (4th Cir. 2006) (Plaintiff's Opposition at 13), which was based upon the now-rejected "motivating factor" test in an ADEA case, is misplaced.

While the *McDonald-Douglas* test remains a viable alternative means of demonstrating age discrimination even after *Gross* should the plaintiff be unable to demonstrate that age was the "but-for" cause of the challenged employer decision, *see Cartee v. Wilbur Smith Associates*, 2010 WL 5059639 (D.S.C. 2010), at * 3, to prevail at summary judgment applying this test a plaintiff must show:

> (1) she is "a member of a protected class"—that is, 40 years or older; (2) she "suffered an adverse employment action"; (3) she "was performing [her] job duties at a level that met [her] employer's legitimate expectations at the time of the adverse employment action; and (4) the position remained open" or she was replaced by a substantially younger person. *Id.* If Plaintiff can establish a prima facie case, the burden then shifts to the Defendant to produce a legitimate, nondiscriminatory reason for its actions against

---

[3]      This provision of the ADEA specifically states, in pertinent part, that "it shall not be unlawful for an employer . . . (1) to take any action otherwise prohibited under [this statute] where . . . the differentiation is based on reasonable factors other than age."

Plaintiff, *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253–54, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). And if Defendant meets this burden of production, the burden then shifts back to Plaintiff to prove by a preponderance of the evidence that the employer's stated reasons were not its true reasons, but were a pretext for discrimination. *Hill,* 354 F.3d at 285. Of course, this burden of production to demonstrate pretext "merges with the ultimate burden of persuading the court that Plaintiff has been the victim of intentional discrimination." *Id.*

**B.** **Plaintiff Has Failed to Demonstrate that the Reasons for her Discharge Were a Pretext for Unlawful Age Discrimination, or that She was the Victim of Disparate Treatment.**

   **i.** **The Reasons for Plaintiff's Discharge Were Not Pretextual.**

Under the *McDonald-Douglas* test the Plaintiff has concededly met three (3) of the four (4) requirements: (1) she is a member of a protected class (over 40 years of age); (2) she suffered an adverse employment consequence (termination); and (3) she was replaced by a younger employee. (Plaintiff's Opposition at 13, 17). What is demonstrably missing, however, is adequate proof that she was discharged "despite her qualifications and performance." (*Id.*, at 17.) Plaintiff's arguments supporting the alleged illegitimacy of her discharge thus fail for a variety of reasons:

1.   Plaintiff's Opposition contains evidence of adequate and even praiseworthy performance, much of it over a decade ago. (*See, e.g.,* Exhibits C1 – C16 attached to Plaintiff's Opposition.) This contrasts sharply with *Platero v. Williams Field Services Company,* 98 Fed. Appx. 819, 2004 U.S. App. LEXIS 10473 (10th Cir. 2004),[4] where the court initially found that the plaintiff's evaluations in the year prior to her termination were successful, in sharp contrast to short, conclusory and highly subjective negative evaluations delivered to the plaintiff on the eve of her discharge. From this abrupt change of heart, the 10th Circuit Court of Appeals initially inferred that the more recent evaluations were pretextual, although on remand the district court –

---

[4]     Cited and discussed in Plaintiff's Opposition at 14.

and, on a second appeal the 10th Circuit – dismissed the case on summary judgment, having determined that the employer had nonetheless adequately documented plaintiff's poor performance so as to justify her separation. *Platero v. Williams Field Services Company*, 173 Fed. Appx. 705, 2006 WL 86485 (10th Cir. 2006).[5]   Nothing in Plaintiff's personnel records attached to either Defendant's Summary Judgment Motion or Plaintiff's Opposition shows adequate performance over a course of at least two (2) years predating her dismissal.  Rather, the Plaintiff was subject to a series of detailed and fully documented performance improvement plans, less than satisfactory evaluations, final warnings, and numerous follow-up meetings with Assistant Branch Manager Templeton-Shank.

2.      In the run-up to her termination the Plaintiff was, unlike the Plaintiff in *Plantero*, scarcely a stellar performer.   When asked about the many discussions she held with her immediate supervisor because of poor performance on the part of her subordinates, the Plaintiff either failed to recall those meetings and the reasons therefor (Plaintiff's Deposition at 127; Exhibit H34 of Plaintiff's Opposition.) or blamed her failings on her "overload" (*Id.* at 129), presumably referring to the amount of work she was expected to complete.  During the course of a full day's deposition the Plaintiff never once attributed her shortcomings in supervising her subordinates – including their apparent failure to listen and respond to her directions – to her branch being short staffed or employees performing multiple tasks.  Yet in her 11th hour affidavit in opposition to Defendants' Motion for Summary Judgment, the Plaintiff presented these excuses for the first time. (Nickens Affidavit, at 3, ¶ 8.)  However, as Judge Motz observed in *The Main Street America Group v. Sears Roebuck & Co.*, 2010 WL 956178 (D. Md. 2010), "[t]o the extent that Defendants' supplemental affidavits offer new theories, as opposed to simply adding detail to

---

[5]      Notably, in her Opposition (at 14) the Plaintiff failed to include what Paul Harvey would have characterized as "the rest of the story," *i.e.*, the Tenth Circuit's eventual decision upholding dismissal of the case on summary judgment.  So ultimately *Platero* is of no help whatsoever to the Plaintiff.

their previously offered reports, they are inadmissible. Therefore, the new theories will not be included in evaluating the admissibility of witnesses or analyzing the motion for summary judgment. They are also inadmissible at trial." *Id.* at *2.

3.    The inclusion in a post-discovery affidavit of Plaintiff's new excuses for poor performance may best be characterized as falling within the "sham affidavit" doctrine, which was best summarized by Judge Titus of this Court as follows:

> Under the sham affidavit doctrine, "a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity." *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806, 119 S. Ct. 1597, 143 L.Ed.2d 966 (1999). Application of the sham affidavit rule at the summary judgment stage "must be carefully limited to situations involving flat contradictions of material fact." *Mandengue v. ADT Sec. Sys., Inc.*, No. ELH–09–3103, 2012 WL 892621, at *18 (D.Md. Mar. 14, 2012). This is one of those situations, and Dr. Kraut's belatedly submitted new affidavit, being flatly contradictory to his deposition testimony, will not be considered.

*Zimmerman v. Novartis Pharmaceuticals Corporation*, 287 F.R.D. 357, 362 (D. Md. 2012). Here, the Plaintiff's original vague excuses for being repeatedly written up and warned for her ineffective or insufficient coaching and the lackluster performance of her subordinate employees ("I don't recall," or "I had too much to do") became, in a post-discovery affidavit, a very different and very specific explanation:  her department was understaffed with employees obligated to multi-task and "who felt they were being treated unfairly." (Plaintiff's Affidavit at 4, ¶ 12.)  In any event, to the extent that the Plaintiff's excuse relies upon the generalized complaints of unidentified employees, it too cannot defeat summary judgment, based upon the hearsay nature of the complaints purportedly made to the Plaintiff.  *Maryland Highways Contractors Association, Inc. v. State of Maryland*, 933 F.2d 1246 (4th Cir.), *cert. denied* 502 U.S. 939 (1991).  *See also Hernandez v. Trawler Miss Vertie Mae, Inc.*, 187 F.3d 432 (4th Cir. 1999); *Rohrbough v. Wyeth Labs, Inc.*, 916 F.2d 970 (4th Cir. 1990).

4.      The record plainly shows that the Plaintiff's discharge in May 2012 was the culmination of months of counseling and warnings by her supervisor, and ultimately her commitment of a serious violation of SECU protocol by releasing funds from a flagged account. Her attempt to blame others, including her own assistant (whom she admittedly trained),[6] for derelictions that included allowing a zero percent (0%) interest rate to be included on at least two (2) customer loans, did not support a finding of pretext.[7] Plaintiff has offered no evidence that is inconsistent with these undisputed facts other than a lengthy affidavit by Jerry Williams, a former SECU employee with no firsthand knowledge of the situation surrounding either Plaintiff's approval of funds to be released on a flagged account or her approval of "zero interest" loans. Mr. Williams admitted that while a teller was responsible for allowing funds to be taken out of a flagged account (Williams Affidavit, at 5, ¶ 15), the teller should have taken the matter to either Branch Manager Edwards or Assistant Branch Manager Shank for approval (*Id.* at 6, ¶ 17.) Instead, the teller approached the Plaintiff, who without consulting either her manager or assistant manager approved the override, thus improperly releasing funds from a flagged account that was

---

[6]      In her just-filed affidavit, the Plaintiff blamed her assistant, Brian Maines – whom she said was successful for his first 90 days, at which time she assigned loan review responsibilities to him (Plaintiff's Affidavit, at 3, ¶ 7) – with creating errors that caused her department to receive "a low loan review score." *Id.* However, she then admits having reassumed responsibility for loan reviews (*Id.* at 3, ¶ 8), just around the time that she began posting zero interest loans.

[7]      The Plaintiff's reliance upon proceedings before, and findings made by the Maryland Department of Labor, Licensing and Regulation ("DLLR") during the course of an unemployment insurance appeal is irrelevant to the issue of pretext *vel non.* In *Jarvis v. Enterprise Fleet Service & Leasing Co.,* 2010 WL 1068146 (D. Md. 2010), Judge Chasanow of this Court rejected the plaintiff's reliance upon the outcome of an unemployment appeal proceeding in making findings regarding pretext in a Title VII lawsuit, noting that "'[f]actual findings made in state unemployment claim proceedings receive no preclusive effect in actions brought under federal statutes despite involving the same operative facts.' *Pettis v. House of Ruth Md., Inc.,* 144 Fed. Appx. 313, 315 (4th Cir.2005) (unpublished) (citing *Ross v. Communications Satellite Corp.,* 759 F.2d 355, 360 (4th Cir.1985), *abrogated on other grounds by Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989)); *see also Univ. of Tennessee v. Elliott,* 478 U.S. 788, 794, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986)." Thus, Judge Chasanow concluded, "the finding by DLLR that there was insufficient evidence of Plaintiff's misconduct is a far cry from a finding that Enterprise discriminated against him on the basis of race and retaliated against him for engaging in protected conduct." *Id.* at * 11.

The very same reasoning applies in this case, wherein the DLLR simply concluded that there was insufficient evidence presented by the employer to support a finding of misconduct. (Exhibit A-4 of Plaintiff's Opposition.)

supposed to be closed.   The Defendant does not see how Mr. Williams' explanation of this dereliction furthers Plaintiff's denial of culpability.

5.      Nor did Mr. Williams' attempt at explaining the zero interest loan problem (*Id.* at 8-9, ¶¶ 29-32) exonerate the Plaintiff from responsibility.   To the contrary, Mr. Williams conceded that before a loan package left a SECU branch, "a member of the leadership team and/or a designated member of the team, performs a verification of the loan, which involves a review of the physical loan documents through use of a paper check list."   (*Id.* at 9, ¶ 31.)   Clearly the Plaintiff failed to conduct this physical review, instead assuming (wrongly, as it turns out) that her assistant – who decidedly was *not* a member of the branch's "leadership team" – would complete that review, without further oversight.   Such a lapse in judgment, along with having overridden a hold on a flagged account, thoroughly supported the legitimate decision to terminate the Plaintiff.

6.      Contrary to Plaintiff's assertion (Plaintiff's Opposition at 14), there are no "inconsistencies between plaintiff's performance evaluations" and her eventual termination, nor are there "weaknesses [or] implausibilities" in SECU's explanation.   (*Id.*, citing *Platero, supra*; *compare Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000) (denying summary judgment where the plaintiff demonstrated that the proffered reasons for his discharge were false)).   Here, the Plaintiff admitted to having overridden a hold on a flagged account but offered the excuse that "the 'flag' was not visible on the account at the time of the transaction." (Plaintiff's Response to Defendants' Statement of Undisputed Material Facts, at ¶ 42.)   Thus, she denied any culpability for allowing $1,900.00 to be given out to a member from an account that was subject to a garnishment (Plaintiff's Dep. at 200, found at Exhibit H52 of Plaintiff's Opposition.)   In her affidavit the Plaintiff now states that she not only inadvertently overrode a hold, but approved the *closing* of the account. (Plaintiff's Affidavit at 5, ¶ 17.)   Plaintiff further

claimed to have been unaware "that there was a garnishment on the account until the week of my termination." (*Id.*)

In an apparent effort to exonerate the Plaintiff from responsibility for approving this transaction, former employee Jerry Williams asserted in his affidavit that he "personally removed funds from an account that had a garnishment lockout placed on the account, for varying reasons, such as to pay for a loss that SECU has directly incurred or as a result of a member's request who was experiencing financial hardships." (Williams Affidavit, at 5, ¶ 13.) Neither Mr. Williams nor the Plaintiff offered such extenuating circumstances to explain Plaintiff's decision to override the hold in this particular case, and in fact Mr. Williams was unable to offer any compelling "exception" that would justify allowing the member in this particular transaction to have access to garnished funds (Williams Affidavit, at 5, ¶ 12).[8]

Whether the Plaintiff could or could not determine the reason for the hold on the account which she chose to override, she never offered – either at her deposition or in her affidavit – a compelling reason for doing so. Nor did she protest during her termination meeting that she was unaware of the garnishment that led to the hold, instead readily admitting that she "d[id] overrides all the time," without further explanation. (Plaintiff's Dep. at 200, found at Exhibit H52 of

---

[8]        Of course, the Plaintiff would not have been in a position to make such an exception if, as she contends, she was unaware of any hold placed on this account. Thus, Mr. Williams' reference to supervisors being able to make exceptions and allow withdrawals over such holds suggests that the existence of such holds on an account – and the reasons therefor – were readily known to SECU supervisors, which is completely contrary to the Plaintiff's denial of such knowledge.

        Besides raising serious doubts as to Plaintiff's credibility, the Williams affidavit sets up a contradiction between the Plaintiff and her principal corroborating witness – a circumstance which cannot serve to defeat summary judgment. This contradiction falls squarely within the "sham affidavit" doctrine, discussed *supra*. *Jiminez v. All American Rathskeller, Inc.*, 503 F.3d 247, 253 (3d. Cir.2007) (holding that an affidavit that conflicted with the affiant's testimony and other evidence did not raise a genuine issue of fact to defeat summary judgment). As the Third Circuit held in *Hackman v. Valley Fair*, 932 F. 2d 239, 241 (3d Cir. 1991), a sham affidavit "cannot raise a genuine issue of fact because it is merely a variance from earlier deposition testimony, and therefore no reasonable jury could rely on it to find for the nonmovant." Furthermore, "when a party does not explain a contradiction between a subsequent affidavit and a prior deposition, it is appropriate for the district court to disregard the subsequent affidavit as a 'sham,' therefore not creating an impediment to grant a summary judgment based on the deposition." *Id.* Moreover, when there is no independent evidence on the record to support an otherwise questionable affidavit, courts may disregard the affidavit. *Baer v. Chase*, 392 F.3d 609, 625 (3d Cir. 2004). Such is the case with both the Plaintiff's and Mr. Williams' 11th hour affidavits, it is submitted.

Plaintiff's Opposition.)  In fact, it is clear from Plaintiff's own admissions that she did not look into the account to determine whether an override was warranted; she simply approved it, without further investigation.  This alone negates any notion of pretext in the decision to terminate her employment.  Here, as in *Morrall v. Gates,* 370 Fed. Appx. 396 (4th Cir. 2010), "[t]he record demonstrates that [the Plaintiff's] relationship with her supervisors was difficult, and her employment was fraught with her written and verbal complaints about a broad variety of subjects. Whether an employee is performing at a level that meets legitimate expectations is based on the employer's perception, and [the plaintiff's] own, unsubstantiated assertions to the contrary are insufficient to stave off summary judgment. *King v. Rumsfeld,* 328 F.3d 145, 149 (4th Cir.2003)."

   ii.    **Plaintiff Has Failed to Demonstrate that she was the Victim of Disparate Treatment.**

   The Plaintiff's disparate treatment claim appears to rely upon comparisons between the conduct for which she was discharged and what Plaintiff contends is similar conduct committed by other SECU employees – primarily branch manager Carlos Edwards – which purportedly resulted in less severe consequences.   As we show below, this theory of discrimination is unavailing in the instant case.

   1.    In *Pilger v. D.M. Bowman, Inc.,* 833 F. Supp. 2d 489 (D. Md. 2011), Judge Quarles of this Court  observed that while "more favorable treatment of younger employees may show discrimination," citing *See Ruff v. Target Stores, Inc.,* 226 Fed. Appx. 294, 303–04 (4th Cir. 2007), "such evidence does not preclude summary judgment when the younger employee is not comparable to the plaintiff. A younger employee may not be comparable when he is subject to different performance standards or has significantly less experience than the plaintiff. *See Senske v. Sybase, Inc.,* 588 F.3d 501, 510 (7th Cir.2009); *Forrest v. Transit Mgmt., Inc.,* 245 Fed.Appx. 255, 257 (4th Cir.2007)." *Pilger,* 833 F. Supp. 2d at 497.

2.      Plaintiff's alleged disparate treatment evidence focuses almost entirely on an attempted comparison between herself and branch manager Carlos Edwards (Plaintiff's Opposition at 16-17).  Comparing herself to Branch Manager Edwards, who was younger (but who notably approved Plaintiff's promotion to lead financial services consultant just a few years before her termination),[9] the Plaintiff contends that his placement on three (3) performance improvement plans and receipt of two (2) unsatisfactory performance reviews, coupled with his approval of withdrawals that allegedly resulted in SECU incurring losses, should have resulted in dismissal.

3.      Mr. Edwards is a vastly different employee than the Plaintiff, both in terms of experience with SECU and with respect to his job responsibilities.  Whereas Plaintiff had held various positions with SECU for over 16 years (Plaintiff's Opposition, at 13), Mr. Edwards was with SECU fewer years (beginning in 2005, or just 7 years at the time of Plaintiff's discharge; Defendant Edwards' Answer to Interrogatory #3, at 5).  Mr. Edwards served in supervisory positions from the outset (first as assistant branch manager, later as branch manager), and reported to an entirely different supervisor than the Plaintiff, who reported to assistant branch manager Shank, one of Mr. Edwards' subordinates.  Unlike the Plaintiff, Mr. Edwards was only briefly placed on performance improvement plans, from which he was successfully removed (*See, e.g.,* Memo dated March 31, 2010, by Mr. Edwards' supervisor Lisa Robbins, **Exhibit 1**, which was included in response to Plaintiff's Request for Production of Documents.)  In comparison to Plaintiff's continuing lackluster performance, Mr. Edwards was praised for having made "significant improvement in the team morale in [his] branch, and by all indications . . . ha[s]

---

[9]      The fact that the same decision-maker who enthusiastically approved Plaintiff's promotion at a time when she was well beyond 40 years of age later recommended her termination is, under Fourth Circuit law, further proof of an absence of discriminatory animus in the challenged decision.  *Birbeck v. Marvel Lighting Corp.*, 30 F.3d 507, 513 (4th Cir. 1994) ("As we have stated, 'employers who knowingly hire workers within a protected group seldom will be credible targets for charges of pretextual firing.'"), *citing and quoting from Proud v. Stone*, 945 F.2d 796, 798 (4th Cir. 1991).

become more engaged with [his] team members."  Unlike the Plaintiff, whose coaching efforts remained subject to continuing criticism, Mr. Edwards' coaching improved in both quantity and quality. (*Id.*)

Moreover, neither the Plaintiff nor Mr. Williams was able to explain the entire set of circumstances surrounding those instances in which Mr. Edwards either overrode holds on flagged accounts or approved the cashing of a money order by a SECU member.  In other words, there may well have been extenuating or mitigating circumstances that led to Mr. Edwards' decisions which convinced his superiors that termination would have been unwarranted, but the Plaintiff was unable to offer any facts beyond the bare allegations of what Mr. Edwards purportedly did.[10]

Finally, Mr. Edwards' reported derelictions – which she describes as "remov[ing a] hold from an account" and "cash[ing] fraudulent money-orders" in violation of Company policy"[11] (Plaintiff's Opposition, at 16) – did not include approval of zero interest loans, which only Plaintiff committed, and for which she offered no evidence of comparators with similar derelictions other than her own subordinate from whom she admittedly took back this responsibility.

4.    In *Forrest v. Transit Management of Charlotte, Inc.*, 245 Fed. Appx. 255 (4th Cir. 2007), the Fourth Circuit observed, in a case in which the plaintiff sought to draw a comparison with another individual where both had been involved in allegedly similar altercations on the job:

---

[10]    During the course of a deposition spanning two (2) days, the Plaintiff's attorney failed to ask Mr. Edwards a single question about the circumstances surrounding his approval of either the override or the cashing of money orders.  Nor did Plaintiff's counsel choose to depose Mr. Edwards' supervisor in order to determine the reasoning behind any disciplinary actions taken against him.

[11]    With absolutely no support in the record, Plaintiff characterized Mr. Edwards' actions in regards to the money orders as "willful" violations of "Company Policy."  (Plaintiff's Opposition at 16.) Without knowing all of the facts and circumstances surrounding this transaction – including Mr. Edwards' precise state of mind – the Plaintiff is hardly in a position to characterize his actions as a "willful" violation of SECU policies or procedures.

If different decision-makers are involved, employees are generally not similarly situated. *See Plair v. E.J. Brach & Sons, Inc.,* 105 F.3d 343, 350 n. 3 (7th Cir.1997); *see also Shumway v. United Parcel Serv., Inc.,* 118 F.3d 60, 64 (2d Cir.1997). Accordingly, because a different supervisor was involved in the incident that Forrest compares to his own, and Forrest failed to provide any evidence that would allow for an adequate comparison between the two decision-makers, we find the different outcomes of the two incidents unpersuasive. This is especially so in light of both the lack of clarity as to the facts of the prior confrontation and uncontradicted testimony indicating that disciplinary decisions were largely left to the discretion of each supervisor. *See Jones v. Bessemer Carraway Med. Ctr.,* 137 F.3d 1306, 1312 n. 7 (11th Cir.), *modified on reh'g,* 151 F.3d 1321 (11th Cir.1998). Therefore, we find that the district court did not err in granting judgment as a matter of law in favor of Transit Management.

245 Fed. Appx. at 256.

Similarly, in *Lightner v. City of Wilmington,* 545 F.3d 260 (4th Cir. 2008), the Fourth Circuit, citing *Moore v. City of Charlotte,* 754 F.2d 1100 (4th Cir. 1985), observed that "[t]he similarity between comparators and the seriousness of their respective offenses must be clearly established in order to be meaningful. . . . The difference in their positions within the [Wilmington Police Department] makes the purported comparison in this case too loose." There, the plaintiff tried to draw a comparison between an acting division commander and a rank-and-file officer. *See also Haywood v. Locke,* 387 Fed. Appx. 355, 359-360 (4th Cir. 2010) (rejecting a comparison between an employee and a supervisor significantly farther up the chain of command based upon the following reasoning: "There are by no means 'enough common features between the individuals to allow [for] a meaningful comparison.' *Humphries v. CBOCS West, Inc.,* 474 F.3d 387, 405 (7th Cir.2007), *aff'd on other grounds,* 553 U.S. 442, 128 S.Ct. 1951, 170 L.Ed.2d 864 (2008).")

5.      Even where there is evidence of comparable derelictions that resulted in the termination of the Plaintiff while the branch manager remained employed, to overcome summary judgment the Plaintiff must still show that the "but-for" reason for her discharge was her age. *Kess v. Municipal Employees Credit Union of Baltimore, Inc.,* 319 F. Supp. 2d 637, 647-648 (D.

Md. 2004) (finding that even where there is evidence of similarly situated employees treated more favorably than the plaintiff, pretext is still not established where the employer offered legitimate non-discriminatory reasons for termination). This the Plaintiff has patently failed to do.

**C.   Plaintiff's "Disparate Impact" Theory of Discrimination Is Similarly Unsupported.**

While the Supreme Court validated the application of the "disparate impact" theory of discrimination in ADEA cases, *Smith v. City of Jackson*, 544 U.S. 228 (2005), it later observed in *Meacham v. Knolls Power Atomic Laboratory,* 554 U.S. 84, 101 (2008), that "Congress took account of the distinctive nature of age discrimination, and the need to preserve a fair degree of leeway for employment decisions with effects that correlate with age, when it put the [reasonable factors other than age] clause into the ADEA, 'significantly narrow[ing] its coverage.'" (*Citing and quoting from City of Jackson, supra*, 544 U.S. at 233.)

1.   Plaintiff's entire "disparate impact" theory of liability is predicated upon the institution of the so-called "Different Direction" marketing campaign, which while left out of Plaintiff's Opposition, is raised in an affidavit by former employee Jerry Williams, who alleged that the program "involved the termination of many of the employee of SECU, over a then non-disclosed time frame." (Williams Affidavit, at 10, ¶ 34.) Mr. Williams focuses much of his attention on the notion that leadership changes within SECU led to the departure of employees, "many of which [*sic*] were older in age and had become fully vested and well qualified in their profession." (*Id.*, at 12, ¶ 40.) One example he pointed out was the elimination of the position of "greeter" at the various branches. (*Id.* at 13, ¶ 41.)

2.   None of Mr. Williams' assertions about changes to SECU's "culture," including his complaints about the spin-off of certain of SECU's operations and the institution of what he

calls the "New Direction"[12] marketing program, are related to the specifics of Plaintiff's termination. Even assuming the truth of his contention that SECU "move[d] seasoned older employees and transfer[red] them to another location substantial distances from their homes with the expectation that they needed to adapt quickly to their new environment" (*Id.* at 13, ¶ 43), this allegation has absolutely nothing to do with the Plaintiff, who remained at the Towson branch throughout her over 15-year career. As one court stated in rejecting a similarly broad, unfounded claim, "Conjecture and opinion alone cannot support a *prima facie* case of disparate impact." *Chapman v. Lorillard Tobacco Company*, 342 F. Supp. 2d 383, 395 (M.D.N.C. 2004).

  3. In *Harris v. Marsh*, 679 F. Supp. 1304, 1307 (E.D.N.C. 1987), the court rejected claims of "excessive subjectivity" which, according to the plaintiff, led to the "discriminatory discipline of black employees." In so ruling, the court referred to a previous order in which it specifically stated that "Plaintiff may present *any* anecdotal or statistical evidence which is directly relevant to any claim for relief [but] may not present anecdotal evidence which is relevant only to establish a pattern or practice, *excessive subjectivity* or disparate impact claim and which is *not* directly relevant to any individual plaintiff['s] claim[s] for relief." *Id.* at 1307, n.159 (emphasis original). Here, Plaintiff's proffer of Mr. Williams' generalized complaints about SECU's cultural changes, the spin-off of certain SECU functions to a separate entity, or CEO Staatz' finances, have nothing whatsoever to do with Plaintiff's individual claim, and should therefore be similarly rejected. Nor did Mr. Williams identify a single employee who was actually demoted and replaced by a younger employee with commercial bank experience. (*See* Williams Affidavit, at 13, ¶ 43.) Thus, his contentions are at best unfounded, generalized

---

[12] Remarkably Mr. Williams is not even familiar with the program's correct name, which is "Different Direction." His departure from SECU many years before he prepared his affidavit is reflected in his lack of specific contemporary knowledge of SECU's operations, including simple details such as the name of this program.

statements that support neither a pattern or practice of age discrimination nor Plaintiff's individual claim.

    4.    In light of detailed explanations of SECU's "Different Direction" marketing strategy offered by Defendants Staatz and Groshko, the record contains an adequate "reason other than age" ("RFOA") to support dismissal of Plaintiff's "disparate impact" theory. *Meacham, supra; Smith v. Verizon Washington, D.C.*, 2013 WL 1316391 (D. Md. 2013).

    5.    In *EEOC v. Freeman*, 961 F. Supp. 2d 783 (D. Md. 2013), Judge Titus described the principal flaw in Plaintiff's "disparate impact" claim:

> Proof of disparate impact requires reliable and accurate statistical analysis performed by a qualified expert. As the Supreme Court has noted, "the inevitable focus on statistics in disparate impact cases" results in a very "high standard[ ] of proof" that can be difficult for plaintiffs to meet. *Watson v. Fort Worth Bank and Trust*, 487 U.S. 977, 992, 999, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988). Merely pointing to "statistical disparities in the employer's work force" is not sufficient; the plaintiff must provide "statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group." *Id.* at 994, 108 S.Ct. 2777. Even if the plaintiff is able to proffer such evidence, neither "courts [n]or defendants [are] obliged to assume that plaintiffs' statistical evidence is reliable," but can challenge the techniques or data used in the analysis. *Id.* at 996, 108 S.Ct. 2777. Moreover, even if meaningful and reliable statistics are presented, a plaintiff is required to separate out and identify the "specific" employment practice that is allegedly responsible for the disparate impact, particularly where employers combine objective and subjective hiring criteria. *Id.* at 994, 108 S.Ct. 2777.

961 F. Supp. 2d at 786. Here, Plaintiff has pointed to no statistical disparities arising from the institution of SECU's "Different Direction" program.  To the contrary, SECU presented statistical evidence of an almost 50 percent older workforce *even after the program was commenced.* Nor did the Plaintiff present expert evidence to show either that the program or any

other policy or practice instituted by SECU caused an exodus of older employees.[13] *See also Brown v. Nucor Corp.*, 785 F. 3d 895, 915 (4th Cir. 2015) ("Statistics and anecdotes suggesting a pattern of discrimination, however, are not enough alone to sustain a disparate impact claim. . . . Disparate impact liability requires the identification of a specific employment *practice* that caused racially disparate results.") (Emphasis original.)

### D.   The Record Lacks Evidence that Plaintiff Was Subjected to a "Hostile Work Environment Based on her Age."

The sole basis for Plaintiff's claim of a "hostile work environment" is that she was "overloaded [ ] with work meant for two positions," and that she was "placed on [performance improvement plans] as a means of making the work place hostile." (Plaintiff's Opposition, at 21.)  In support of her "hostile work environment" claim, the Plaintiff cites to extreme examples of workplace sexual harassment – *Harris v. Forklift Systems, Inc.*, 510 U.S. 17 (1993), in which the plaintiff's boss (who was also the company president) continually degraded women and asked the plaintiff to sleep with customers in order to improve sales; and *Meritor Savings Bank v. Vinson*, 477 U.S. 57 (1986), in which the plaintiff was repeatedly victimized by her boss, who followed her into the ladies' room and exposed himself to her.  These cases are hardly in the same league (much less ballpark) as the instant case, who at worst was asked to take on additional assignments without a concomitant increase in pay for approximately two years.

1.   The record contains evidence that the Plaintiff received considerable free training from her employer in a variety of work-related tasks, and that she was eventually assigned an

---

[13]     By suggesting that the "Different Direction" program caused resistance and failure among employees with long service at SECU, the Plaintiff appears to confuse years of service with an employee's age.  As the Supreme Court held in *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 611 (1993), an employer does not violate the ADEA by discriminating on the basis of years of service, because "[a]n employee who is younger than 40, and therefore outside the class of older workers as defined by the ADEA, . . . may have worked for a particular employer his entire career, while an older worker may have been newly hired. Because age and years of service are analytically distinct, an employer can take account of one while ignoring the other, and thus it is incorrect to say that a decision based on years of service is necessarily 'age based.'"

assistant (Brian Manes) whose job was to assume some of her work load.  She admittedly was treated with respect at all times, even during performance-related meetings.  Compare this to *Harris, supra,* in which the Supreme Court defined a "hostile work environment" as one "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  510 U.S. at 21, *quoted in Boyer-Liberto v. Fountainbleu Corp.*, 786 F. 3d 264, 277 (4th Cir. 2015) (*en banc*).  This is clearly not the case in the instant matter.

      2.    Merely assigning a plaintiff an excessive workload, without significantly more, has been deemed insufficient to support a "hostile work environment" claim.  *Thomas v. Northern Telecom, Inc.*, 157 F. Supp. 2d 627 (M.D.N.C. 2000).  Here, as in *Berini v. Federal Reserve Bank of St. Louis, 8th District*, 420 F. Supp. 2d 1030 (E.D. Mo. 2006), "although plaintiff claims that the absence of a co-worker resulted in an excessive workload for her, plaintiff's performance did not improve when the co-worker returned, well before the plaintiff was terminated."  420 F. Supp. 2d at 1038.  The analogy to the hiring of Brian Manes to assist Plaintiff is unmistakable; even after he commenced work as Plaintiff's assistant, her performance failed to improve, and indeed, she made even more mistakes and continued to neglect her coaching responsibilities.  That she was warned and placed on a series of performance improvement plans did not constitute her environment "hostile" based upon age or any other unlawful consideration.

      3.    Absent an analysis of the age of her co-workers in the Towson branch, the Plaintiff cannot demonstrate that her age was a factor in any employer action or workplace conduct, including assigning her what she believed to be an excessive workload.[14]  As one court

---

[14]    Indeed, in her affidavit the Plaintiff contends that employees in the branch were generally overworked across-the-board.  (Plaintiff's Affidavit, at 3, ¶8.)  If that is the case, her allegedly excessive job responsibilities cannot be found to have resulted from having been targeted due to her age or any other protected status.

observed, "[w]ithout any actual assertion of age-based discrimination, [the plaintiff] does not state a prima facie case." *Lee v. City of Philadelphia*, 2008 WL 2697320 (E.D. Pa. 2008), at *3. Moreover, "[a]ssigning an employee an excessive workload does not constitute 'extreme and outrageous' behavior." *Grey v. Sears Roebuck & Co.*, 131 F. Supp. 2d 895, 905 (S.D. Tex. 2001).

4.     Here, as in *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 463 (7th Cir. 1986), "[t]he record also demonstrates that [the Plaintiff] has failed to carry [her] burden of clearly establishing that the [employer's] expectations were unreasonable. There is a complete absence of any showing in the record that [her] workload was excessive, that [her] assignments were unachievable, or that the demands placed upon [her] were unreasonable. As a result, [the Plaintiff] has failed to state a *prima facie* case of age discrimination under the ADEA." (Citing *Huhn v. Koehring,* 718 F.2d 239, 244–45 (7th Cir.1983).

5.     The Seventh Circuit best stated the posture of the current case in *Kephart v. Institute of Gas Technology,* 630 F.2d 1217 (7th Cir.1980), where it concluded:

> The plaintiff must show as part of his *prima facie* case only that he 'met his employer's *legitimate* expectations.' This formulation raises the question whether the plaintiff would be permitted to show that the employer's demands were illegitimate in the sense of being unfair or arbitrary. Plaintiff's assertion that the company's goals in the Columbia Gas project were unrealistic or constituted an approach to research that Kephart considered unsound might be relevant under this approach. The Age Discrimination in Employment Act, however, was not intended for a vehicle for judicial review of business decisions.... The question before the court is not whether the company's methods were sound, or whether its dismissal of Kephart was an error of business judgment. The question is whether he was discriminated against because of his age. Although an employer may not make unreasonable expectations, and must make the employee aware of just what his expectations are, beyond that the court will not inquire into the defendant's method of conducting its business. If Kephart was not doing what his employer wanted him to do, he was not doing his job. . . .

Here, as in *Kephart*, the Plaintiff was demonstrably unable or unwilling to meet her employer's reasonable expectations. Her placement on plans of assistance were not intended to punish her, but to encourage improvement and success. Sadly the goals of those plans were not achieved, but they certainly did not place the Plaintiff into a hostile working environment.

Here, as in *Harrison v. Office of Architect of the Capitol*, 964 F. Supp. 2d 81, 92 (D.D.C. 2013):

> The Plaintiff [ ] failed to demonstrate that the issuance of the performance improvement plan was a materially adverse action, nor did the Plaintiff rebut the Defendant's legitimate, non-discriminatory explanation for the issuance of the plan. Finally, no reasonable jury could conclude that the purportedly hostile actions, viewed as a whole, were sufficiently severe or pervasive so as to create a hostile work environment.

## V.   It is Far Too Late to Allow Plaintiff to Amend Her Complaint.

This case was filed over two years ago, and discovery was completed this past April. The Defendants' Motion for Summary Judgment has been filed and opposed, with a trial scheduled in less than 90 days. Yet Plaintiff has sought an 11th hour request for leave to amend her Complaint yet again "if the Court is inclined to agree with Defendants that Plaintiff's Complaint is deficient." (Plaintiff's Opposition, at 22.) This case is no longer about the deficiency of the Amended Complaint; it is now about the deficiency of proof developed during months of discovery. Thus, it is far too late, and the Defendant would suffer considerable prejudice if, at this late date, Plaintiff were allowed to amend her previously Amended Complaint in some yet unforeseen manner.

"Courts disfavor belated claims that change the character of litigation." *Equal Rights Center v. Archstone Smith Trust*, 603 F. Supp. 2d 814, 818 (D. Md. 2009), *aff'd sum nom. Equal Rights Center v. Niles Bolton Associates*, 602 F.3d 97 (4th Cir. 2010), citing *Deasy v. Hill*, 833 F.2d 38, 42 (4th Cir. 1987). "[I]t is within the district court's sound discretion to deny leave to amend when a motion to amend is made after the close of discovery and is based on information

known to the moving party during the discovery phase of the case." *Smithfield Foods, Inc. v. UFCW Int'l Union*, 254 F.R.D. 274, 279 (E.D. Va. 2008), *citing and quoting from First Nat'l Bank v. Master Auto Service Corp.*, 693 F.3d 308, 314 (4th Cir. 1982).

To allow the Plaintiff to somehow cure any failing in the facts or legal theories of her case long after discovery has ended and so close to trial would be unduly prejudicial and plainly unwarranted. *CoStar Realty Information, Inc. v. Field*, 737 F. Supp. 2d 496, 503-504 (D. Md. 2010). Therefore, we respectfully urge the Court to deny any attempt to amend the Complaint in this case. *Redding v. Anne Arundel County, Maryland*, 996 F. Supp. 488, 491 (D. Md. 1998) (finding late-filed amendment untimely and prejudicial to the defendant).

## VI.  Conclusion

Based upon the facts, argument, and authorities cited in both this pleading and in the Memorandum in Support of the Defendants' Motion for Summary Judgment, the Defendants State Employees Credit Union of Maryland, Inc., Carlos Edwards, Tracy Templeton-Shank, and Christopher Groshko respectfully request that this Court GRANT its Motion for Summary Judgment and that it DISMISS each remaining Count of the Amended Complaint, with prejudice.[15]

Respectfully submitted,

/s/
_____
Leslie Robert Stellman (Federal Bar No. 01673)
lstellman@pklaw.com
PESSIN KATZ LAW, P.A.
901 Dulaney Valley Road, Suite 500
Towson, Maryland 21204
Telephone:  (410) 938-8800
COUNSEL FOR THE DEFENDANTS STATE EMPLOYEES
CREDIT UNION, INC., CARLOS EDWARDS, TRACY
SHANK AND CHRISTOPHER GROSHKO

---

[15]    Given the frivolous nature of at least two (2) of the remaining Counts contained in the Amended Complaint (specifically, Counts 4 and 5, alleging "wrongful termination"), the individually named Defendants reserve the right to seek appropriate sanctions should this Motion be granted as to those particular Counts.